Page 1

1               UNITED STATES DISTRICT COURT
2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3

4   CHRISTENSEN SHIPYARDS, LTD.,  )
    a Washington Corporation,     )
5                                 )
              Plaintiff,          )
6                                 )
         vs.                      )
7                                 )   CASE NO. CV6641
    ST. PAUL FIRE AND MARINE      )
8   INSURANCE COMPANY, a foreign  )   **CONFIDENTIAL**
    corporation and NAVIGATORS    )
9   INSURANCE COMPANY, a foreign  )
    corporation,                  )
10                                )
              Defendants.         )
11  _____x

*(handwritten: RECEIVED AUG 09 2007 — Firm LANE POWELL PC — TIME 1:05 ATTY C Huber)*

*(handwritten annotation: ST Paul objects to Plaintiff designating any testimony from David Friedland because he is under plaintiffs control.)*

12

13                    200 South Biscayne Boulevard
14                    Miami, Florida
                      Monday, May 21, 2007
                      9:40 o'clock a.m.
15

16          DEPOSITION OF: DAVID K. FRIEDLAND, ESQ.

17

18

19

20          ROSENBERG & ASSOCIATES, INC.

21     Certified Shorthand Reporters & Videographers

22        425 Eagle Rock Avenue - Suite 201

23          Roseland, New Jersey 07068

24             (973) 228 - 9100

25          www.rosenbergandassociates.com

CONFIDENTIAL

Page 4

1          Deposition of DAVID K. FRIEDLAND, ESQUIRE, a

2   witness of lawful age, taken by the Defendant for the

3   purpose of discovery and for use as evidence in the

4   above-entitled cause, wherein Christensen Shipyards, Ltd.

5   is the Plaintiff and St. Paul Fire and Marine Insurance

6   Company, et al. are the Defendants, pending in the United

7   States District Court, Western District of Washington

8   pursuant to notice heretofore filed, before Cindy M.

9   Whiting, a Certified Registered Professional Reporter and

10  Notary Public in and for the State of Florida at Large, at

11  the Offices of Duane Morris, LLP, 200 South Biscayne

12  Boulevard, Miami, Miami-Dade County, Florida, on the 21st

13  day of May, 2007, commencing at 9:40 o'clock a.m.

14              - - - - - - - - - - - -

15          DAVID K. FRIEDLAND, ESQUIRE,

16  having been first duly sworn to tell the truth, the whole

17  truth and nothing but the truth, testified as follows:

18                  DIRECT EXAMINATION

19  BY MR. CARBIN:

20      Q    Mr. Friedland, good morning.

21      A    Good morning.

22      Q    We met off the record, my name is Jim Carbin,

23  I'm the attorney for St. Paul Fire and Marine and I want

24  to ask you some questions.  If anything I ask you is

25  unclear, please tell me and I'll do my best to make the

CONFIDENTIAL

Page 5

1    questions as clear as I can.  How is that?

2        A    Okay.

3        Q    Would you tell us your full name, please.

4        A    David Kenneth Friedland.

5        Q    What is your home address?

6        A    8375 Southwest 58th Avenue in Miami.

7            MR. CARBIN:  Off the record.

8            (Friedland's Exhibit 150 was marked for

9            Identification.)

10   BY MR. CARBIN:

11       Q    Mr. Friedland, show you what we've marked as

12   Exhibit 150, do you recognize it to be a subpoena served

13   on your office?

14       A    I believe it has my cover letter attached to it

15   as well.  It appears to be a copy of one of two separate

16   subpoenas that your office delivered to my office.

17       Q    And am I correct that you're appearing here

18   pursuant to subpoena?

19       A    Yes.

20       Q    And am I also correct that the subpoena called

21   for a production of documents from your office?

22       A    It did.

23       Q    And I believe that production was made.

24       A    Through Christensen's counsel, yes.

25       Q    Are you represented by counsel here today?

CONFIDENTIAL

1    A    Yes.

2    Q    Who is that counsel?

3    A    Ms. Carr.

4    Q    When did you retain her?

5    A    Shortly after I learned that you wanted to take

6  my deposition.

7    Q    When would that have been, approximately, as

8  best you can recall?

9    A    Late last year.

10   Q    What do you do for an occupation?

11   A    I'm an attorney.

12   Q    Where are you admitted?

13   A    What states am I admitted in?

14   Q    To practice law, yes.

15   A    Georgia and Florida.

16   Q    When were you admitted in each of those

17  jurisdictions?

18   A    Georgia 1989, Florida also 1989, I believe.

19   Q    Have you been practicing law continuously since

20  then, since your admission?

21   A    Since January 1989, yes.

22   Q    What is the nature of your practice?

23   A    I am an intellectual property law attorney.  I

24  am a registered patent attorney and a shareholder in a law

25  firm in Coral Gables that provides legal services solely

CONFIDENTIAL

1   in the area of intellectual property law.

2       Q    What firm is that?

3       A    Lott & Friedland.

4       Q    How long have you been a member of Lott &

5   Friedland?

6       A    July '94.

7       Q    Have you been affiliated with Lott & Friedland

8   in Florida since July of '94?

9       A    No.  I've been affiliated will Lott & Friedland

10  in Florida since July '91.  I became a member of the firm

11  in July '94.

12      Q    You anticipated my next question.  When did you

13  join Lott & Friedland?

14      A    July '91.

15      Q    Have you ever been sanctioned or reprimanded in

16  your handling of a professional duty?

17      A    By whom?

18      Q    Anyone.

19      A    I've been criticized by my partners for not

20  doing something the way they wanted to do; but not

21  officially sanctioned by a Bar organization or anything

22  like that.

23      Q    Or a court?

24      A    Or a court.

25      Q    Do you have a -- withdrawn.

CONFIDENTIAL

Page 9

1      A      Mr. and Ms. Woods and the company that owned the

2   yacht.

3      Q      Yes.

4      A      Okay.

5      Q      What role did you play with respect to the

6   litigation by the Woods camp against Christensen?

7      A      I played different roles at different periods of

8   time, so perhaps you can ask the question with a little

9   bit more detail, or if you want, I can just give you a

10  chronological narrative.

11     Q      That's what I was going to ask you to do.

12     A      Okay.  The lawsuit was filed late October, earl

13  November of '04, seeking a preliminary injunction.  Case

14  Marshall contacted our firm to represent Christensen at

15  the preliminary injunction hearing; it was attended by my

16  partner and one of our associates in the first week of

17  November.  Through about January --

18     Q      If I could ask you, as you go through the

19  scenario - you say the TRO was attended by your client or

20  an associate in your office, who was that?

21     A      Leslie Lott and, I believe, Janet Moreira,

22  M-O-R-E-I-R-A.

23     Q      Thank you.

24     A      I was not in attendance, because I was getting

25  married.

1    When I returned to the office, I assumed primary

2    responsibility within our firm for the case. Sometime,

3    probably the end of November, beginning December, we filed

4    a motion to dismiss or transfer the case.

5        Q    This is '04?

6        A    Yes.  Within the time - I don't remember if when

7    we consented to the entry of a preliminary injunction, we

8    were given a date - a specific date to respond to the

9    complaint or if we negotiated an extension with Doug

10   Baldrige's firm.  But whenever our answer was due or a

11   response of pleading, we filed a motion to dismiss or

12   transfer the case to the State of Washington.

13       Q    Am I correct that motion of transfer was based

14   upon the contract between Christensen and the boat

15   purchaser?

16       A    I don't remember at this time.  I don't remember

17   if it was based on a contract clause or convenience of

18   venue and location of documents, it - or a combination of

19   the two, I don't remember.

20            You want to go back to my narrative?

21       Q    Please.

22       A    Maybe late December '04, early January, February

23   of '05, Casey Marshall of Christensen hired Peterson

24   Young Putra of Washington to be our co-counsel on the

25   case.  So, from that point forward, I was - I was now

CONFIDENTIAL

Page 11

1    co-counsel, as opposed to sole counsel for Christensen.

2    And from - from whenever Jan Peterson and Mike Wampold and

3    their office started working on the case through the

4    settlement, we worked as co-counsel.

5         Q    Were you the primary attorney at Lott &

6    Friedland throughout the litigation between Woods and

7    Christensen?

8         A    Except for the very beginning when I was off

9    getting married, yes.

10        Q    Who took the - withdrawn.

11             Who attended on behalf of the Christensen camp

12   the various depositions that were taken in the underlying

13   case?

14             MS. CARR:  Objection, vague; broad.

15             THE WITNESS:  Without giving you a number, there

16        were probably 15 deposition and there were different

17        people attending each deposition.

18   BY MR. CARBIN:

19        Q    Did anyone from your office attend any of the

20   depositions?

21        A    Any, yes; all, no.

22        Q    Would it be fair to say that the Peterson Young

23   firm, Mike Wampold in particular, took most of the

24   depositions?

25        A    No.

CONFIDENTIAL

1        Q      By your office.

2        A      No.

3        Q      If the case had gone to trial, who was going to

4    be the lead trial attorney for the Christensen defendant?

5        A      What is a lead trial attorney?

6        Q      Huh?

7        A      What is the lead trial attorney?

8        Q      The first chair.

9        A      I'm not sure there would have been a first

10   chair.  I'm not sure.  I mean, the expectations that Jan,

11   Mike and I would have been at counsel table dividing the

12   labor amongst the three of us, who was going to - who was

13   going to cross-examine what witness hadn't been

14   determined.  Who was going to open, who was going to close

15   hadn't been determined.  So, if you want to define the

16   lead lawyer by who sits in what chair, it hadn't been

17   determined and I don't think it had even been discussed.

18       Q      Had you ever heard that if the case did go to

19   trial, Jan Peterson would be the lead trial attorney for

20   the Christensen camp?

21       A      No; but it wouldn't surprise me that we would

22   give Jan the most prominent role.  He was the senior of

23   all of us involved and the most experienced.

24       Q      What was your understanding of why Peterson

25   Young and Putra were co-counsel on a Florida pending in

CONFIDENTIAL

1    BY MR. CARBIN:

2        Q    Were you consulted?

3            MS. CARR:  Objection, vague.

4            THE WITNESS:  By whom?

5    BY MR. CARBIN:

6        Q    By Christensen or Mr. Marshall acting for

7    Christensen.

8        A    Not that I can recall.

9        Q    Who was your primary contact at Christensen?

10       A    Including Casey Marshall, it would be Casey or

11   Joe Foggia, depending on what I needed and who I could

12   reach at any given time.

13       Q    What was your understanding of Mr. Marshall's

14   role?

15       A    It was and still is my understanding that he was

16   basically outside general counsel to Christensen.

17       Q    Have you ever met anyone from the St. Paul Fire

18   and Marine Insurance Company?

19           MS. CARR:  Objection, vague.

20           THE WITNESS:  In person, on the phone - in

21   person, on the phone?

22   BY MR. CARBIN:

23       Q    By met, I meant in person.

24       A    Yes.

25       Q    Who was that?

a5473d01-29c3-4e82-b915-07e37edd9ecc

CONFIDENTIAL

Page 19

1      A      Are you talking only about this lawsuit or -- I

2  may have met St. Paul agents throughout my life.  If I

3  focus on this lawsuit, I met Mr. Wade.

4      Q      And you met him the day of the mediation?

5      A      The morning of the mediation at the JW Marriott

6  Hotel.

7      Q      Aside from Mr. Wade in connection with the

8  Christensen/Woods litigation, so we're clear, have you met

9  anybody else from St. Paul?

10      A      Not that I'm aware of.

11      Q      We'll talk about the mediation a bit later.

12      A      Okay.

13      Q      Aside from meeting Mr. Wade on the date of

14  mediation, have you ever spoken to anybody from St. Paul

15  in connection in the Woods/Christensen litigation?

16      A      Yes.

17      Q      Who have you spoken with?

18      A      Donna Zeller and perhaps her assistants in

19  trying to speak to her.

20              MS. FOLEY:  I'm sorry.  I'm having difficulty

21      hearing the witness.  Can you speak up a little bit,

22      please.

23              THE WITNESS:  Sorry, Danielle.

24              MS. CARR:  I have you pulled over as far as it

25      will pull now, maybe that will help.

CONFIDENTIAL

```
 1          MS. FOLEY:  Thank you.
 2   BY MR. CARBIN:
 3       Q   How many times did you speak with Ms. Zeller?
 4       A   I couldn't guess.
 5       Q   What's your best estimate?
 6       A   Couldn't give you one.
 7       Q   You speak to her more than once?
 8       A   Yes.
 9       Q   Did you speak to her more than five times?
10       A   Yes.
11       Q   Did you speak to her more than ten times?
12       A   Don't know.
13       Q   Were those conversations, between five and ten,
14   by phone?
15          MS. CARR:  Objection.
16          THE WITNESS:  Never --
17          MS. CARR:  I'm sorry.  Objection form; misstates
18   prior testimony.
19          THE WITNESS:  First of all, I never said between
20   five and ten, so you're mischaracterizing what I just
21   said.  You asked me five, I said yes.  You asked me
22   ten, I said I didn't know, it could be 30, for all I
23   know.  I don't know how many times I spoke to her.
24   BY MR. CARBIN:
25       Q   What is your best recollection of how many times
```

objection

Argumentative

CONFIDENTIAL

1    you did speak to her?

2        A    I don't have a recollection.

3            MS. CARR:  Objection, asked and answered.

4    BY MR. CARBIN:

5        Q    Do you have a recollection of any of those

6    conversations?

7        A    Generally, yes.  Specifically, no.

8        Q    When did these conversations occur, that is to

9    say, what period of time?

10           MS. CARR:  Objection, lack of foundation.

11           THE WITNESS:  Periodically during the course of

12    the lawsuit.

13    BY MR. CARBIN:

14        Q    Was there any set interim to these periodic

15    conversations?

16        A    No.  We didn't have a call scheduled for the

17    first Thursday of every month or anything like that, if

18    that's what you mean.

19        Q    How many of those calls did you initiate?

20        A    What do you mean by initiate?

21        Q    Pick up the phone and dial her number, or call

22    your secretary to pick up the phone and dial her number.

23        A    I don't know.  We played phone tag a lot.

24    Called her from my cell phone a couple times when I was

25    traveling, she called me a couple times.  It was pretty

CONFIDENTIAL

Page 22

1    much call, leave a voice message, call back.  So, if I'm

2    responding to a voicemail message, I don't necessarily

3    consider that initiating a call, I consider that calling

4    back.  So, I couldn't specify who initiated the calls in

5    terms of how we actually spoke.

6        Q    What do you recall speaking to Mrs. Zeller

7    about?

8        A    Updates in the case.

9        Q    Sorry?

10       A    Updates concerning the status of the case.

11       Q    How many times did you give her an update

12   concerning the status of the case?

13       A    That would pretty much be the only reason I

14   would speak to her, so each time I spoke to her on the

15   phone.

16       Q    What did you tell her particularly in these

17   updates?

18       A    Depends what the update was.

19       Q    Well I'm asking you.

20       A    We filed a motion to dismiss or transfer; the

21   judge denied the motion to dismiss or transfer.

22       Q    That was the second update?

23       A    No.  I have no specific recollection of what

24   happened when, except I know that we filed a motion to

25   dismiss, I would have told her about it.  Because at that

CONFIDENTIAL

Page 23

1    time, I was the only - we were the only law firm involved.

2        Q    So I want to be clear on this.

3            MS. CARR:  Wait.

4            THE WITNESS:  Please don't interrupt me while

5        I'm answering your question.

6            MS. CARR:  Yeah, you need to let him --

7            THE WITNESS:  You've asked me questions, let me

8        finish my question.  I do what you do for a living,

9        so I know that you need to let the witness answer the

10       question.  If you want to interrupt me, you're not

11       going to get answers to my questions.

12   BY MR. CARBIN:

13       Q    I don't want to interrupt you.

14       A    Then don't.

15       Q    I want the record to be clear for both of us.

16       A    Okay.

17       Q    So --

18       A    So let me finish the answer to my question and

19   then you can ask me a follow-up question, if you like.

20       Q    Go ahead.

21       A    Okay.  Whenever an event of substance took place

22   in the case, I would attempt to speak to Ms. Zeller and

23   give her an update.  From time to time, if nothing had

24   happened for a couple months, she may have called me and

25   asked me for an update, in which case, I would say, we're

*Handwritten annotation:* ST Paul objects — No question pending

CONFIDENTIAL

1    still waiting on the judge to rule on the motion to

2    dismiss, or there is nothing going on.  As soon as

3    anything changes, I will let you know.  But matters such

4    as filing the motion to dismiss, the judge ruling on the

5    motion to dismiss, perhaps the commencement of discovery

6    and depositions, those are three or four specific calls or

7    subjects that I can recall speaking to her about.

8          I'm pretty sure that on at least one or two

9    occasions, as we got further into the case, Mike and/or

10   Jan and I spoke to her together, or perhaps Casey, we all

11   spoke to her together about what was going on.  And then

12   at some point, right around the mediation, she disappeared

13   and Mr. Wade showed up at the mediation.

14        Q    Do you have any file notes or records of any of

15   these conversations you indicate you had with Ms. Zeller?

16        A    I don't know.  You have my file.

17        Q    I haven't seen any, that's why I asked.  I want

18   to make sure I'm not missing something.

19        A    I'm not the best of note takers during phone

20   calls.

21        Q    Aside from what you just told us about, is there

22   anything more particular you can recall about any of your

23   communications to Mrs. Zeller?

24        A    No, that was pretty particular.

25        Q    Can you recall any conversations with Ms. Zeller

CONFIDENTIAL

Page 25

1    following the Florida court's denial of the motion to

2    transfer?

3        A    Yes.  Following the court's denial of the motion

4    to transfer, I spoke with her and told her the court had

5    denied the transfer.

6        Q    Do you recall any further conversations with her

7    following the denial of the motion to transfer?

8        A    Yes.  I can recall speaking with her and I

9    believe Mike may have been on the call and we discussed --

10   I believe we discussed the upcoming depositions and I

11   believe the issue of whether or not someone from St. Paul

12   was going to attend the Woods' depositions, but I don't

13   recall for sure.  And the Woods' depositions were, I

14   believe, Jan of '05 -- I'm sorry -- '06.

15       Q    Now, when you say the Woods' deposition; is that

16   the Tiger Woods' deposition?

17       A    The Woodses' depositions were taken on

18   back-to-back days.

19       Q    And who are you referring to as the witnesses

20   when you say the Woods' depositions?

21       A    Same people you're referring to as the Woods

22   camp.

23       Q    I want to be clear.  Are you speaking about

24   Tiger Woods?

25       A    Eldrick Tiger Woods, yes.

CONFIDENTIAL

Page 26

```
 1        Q     His wife?

 2        A     Yes.

 3        Q     Anyone else?

 4        A     I'm not sure if there was a 30(b)(6) of the

 5   corporation, and I'm pretty sure that Chris Hubman was not

 6   deposed at the same time as Tiger Woods and his wife.  I

 7   believe we found a day when Tiger wasn't - was available

 8   and his wife was available the next day.  And Chris

 9   Hubman, we deposed him, I want to say, a couple weeks

10   later.  We deposed him closer to the mediation.

11        Q     Now, in terms of those conversations you may

12   have had with Ms. Zeller and Mr. Wampold concerning the

13   start of the depositions and the Woods' depositions, do

14   you recall anything further about what was discussed

15   during the deposition?

16              MS. CARR:  Objection to the form, argumentative.

17              THE WITNESS:  Can you read that question back,

18        please?

19              (The pending question was read back by Madam

20              Reporter.)

21   BY MR. CARBIN:

22        Q     Let's get to a new question.  With respect to

23   the conversation you may have had with Ms. Zeller and with

24   Mr. Wampold, do you recall anything further about that

25   conversation?
```

CONFIDENTIAL

1           MS. CARR:  Object to the form, argumentative.

2           THE WITNESS:  No.

3    BY MR. CARBIN:

4        Q    Do you recall any comments of Mrs. Zeller during

5    that conversation?

6        A    I - I think she may have asked us to get back to

7    her when the dates were firmed up and she would let us

8    know if she or someone from St. Paul's could attend the

9    deposition of Tiger Woods and his wife, and perhaps

10   Privacy, Limited, whoever we were deposing for that.

11            Oh, and the captain's name was David Yowell, I

12   just remembered his name.

13       Q    Do you recall any other conversations that

14   either Mr. Wampold or Mr. Peterson participated in with

15   you with St. Paul?

16       A    With St. Paul, yes.

17       Q    Okay.  How many other conversations?

18       A    Spent all of April 24th, 2006 having

19   conversations with Bruce Wade of St. Paul with Mr. Wampold

20   and Mr. Petersen.

21       Q    Let's leave the mediation aside for our present

22   purposes.

23       A    That wasn't your question, though, just so you

24   understand.  I'm answering your question.

25       Q    Aside from the conversation you had - you may

CONFIDENTIAL

Page 28

1  have had with Mrs. Zeller and Mr. Wampold that you've

2  described for us, do you recall any other conversations

3  you had with Ms. St. Paul -- excuse me -- with Mrs. Zeller

4  with either Mr. Wampold or Mr. Peterson presently?  And

5  let's leave the mediation aside.

6           MS. CARR:  Object to the form, argumentative.

7           THE WITNESS:  Yes.

8  BY MR. CARBIN:

9      Q    Okay.  How many others of those conversations

10 did you have?

11     A    Don't know.

12     Q    Was it Mr. Wampold or Mr. Peterson, or both of

13 them on the same call, or were there different calls with

14 each of them?

15     A    Could have been any of those.  I have no

16 specific recollection.

17          I can recall a number of times, because Jan

18 Peterson spends his winters in Fort Lauderdale, that

19 getting Mike and Jan both on the phone, even though they

20 worked together, was a conference call.  And I can

21 remember a couple times that we set up conference calls

22 where I would call the two of them or one of them would

23 call the two of us, and then we would try and reach Donna

24 Zeller to speak to her.

25          Q.  Do you recall the substance of any of those

CONFIDENTIAL

Page 29

1    conversations where you got Mrs. Zeller on the line with

2    either Mr. Wampold or Mr. Peterson?

3        A    The substance was the Tiger Woods' litigation.

4        Q    I'm sorry?

5        A    The substance was the Tiger Woods' litigation.

6        Q    Do you recall anything more particular than

7    that, anything about the Tiger Woods' litigation?

8        A    I cannot recall specifically what we talked

9    about at any specific conversation. But as I've already

10   testified, it was either to give her an update of

11   something that had happened or something that was going to

12   happen in litigation.

13       Q    Can you give me any more particulars about what

14   you discussed with Mrs. Zeller during any of these calls,

15   aside from what you told us about already?

16       A    Dates of depositions, upcoming deadline for

17   summary judgment motions, the mediation date.  I believe

18   who the mediator was.  I think we discussed - I'm pretty

19   sure that Ben Kuehne and I were the ones who settled on

20   Judge Scott as the mediator.

21           And at one point, I think there was a telephone

22   conversation, though it may have been a letter, an email

23   advising Donna that we had picked the mediator; what I

24   thought of the mediator and the requirement under our

25   local rules that an adjuster from St. Paul with full

CONFIDENTIAL

1    settlement authority had to show up at the mediation. So

2    I needed to know that the date and the time were going to

3    work for her, because she was going to be traveling across

4    the country for the sole purpose of the mediation. And

5    I'm not sure if Mike or Jan were on that call, that may

6    have just been me.

7         Q    You said you and Woods' local counsel picked a

8    mediator. Prior to selecting former Judge Scott as the

9    mediator, did you speak with St. Paul and secure their

10   agreement on Judge Scott as the mediator?

11        A    That's kind of a tricky question, because we

12   actually didn't retain Judge Scott until about two days

13   before the mediation or maybe the week before. But we --

14   Ben and I had given the names to our respective

15   co-counsel, or in Ben's case, Baldridge was lead counsel.

16        Judge Scott was not the only name. We all

17   agreed on Judge Scott. And if I remember correctly, the

18   conversation I had with Donna about Judge Scott was giving

19   her my recommendation that he would be a good mediator for

20   the case because of the type of personality he has. The

21   unlikely - the unlikelihood that he would be swayed by the

22   fact that Tiger Woods was involved in the case, which was

23   a concern with our mediator selection. So I'm - she

24   was -- Before he was retained, she was aware that he was

25   our recommended choice.

CONFIDENTIAL

1      A      You just told me you have my emails and you

2  haven't seen them, so I assume I didn't.

3      Q      Did you get St. Paul's agreement to Ex-Judge

4  Scott as mediator before he was appointed?

5      A      Did I, personally?

6      Q      Yes.

7      A      No.

8      Q      Did anybody from your office, as far as you

9  know?

10     A      They paid his bill.

11     Q      Will you answer my question, please?

12     A      I don't know.

13     Q      Do you know if anybody from the Christensen camp

14  got St. Paul's agreement to Ex-Judge Scott as a mediator

15  before he was appointed?

16     A      Nobody from Christensen's camp was ever told by

17  St. Paul that Judge Scott could not be our mediator.

18     Q      Will you answer my question?

19     A      I just did.

20     Q      Do you know if anybody from the Christensen camp

21  secured St. Paul's agreement to the appointment of Former

22  Judge Scott as mediator?

23     A      I would infer that Donna Zeller's silence on the

24  issue was her consent.  She knew who we had picked and she

25  knew the mediation was going forward.  She sent Bruce Wade

*Foundation Speculation*

a5473d01-29c3-4e82-b915-07e37edd9ecc

1    to the mediation with the knowledge that Judge Scott would

2    be the mediator.  So, yes, I would say that we all secured

3    St. Paul's consent to the use of Judge Scott.

4           MR. CARBIN:  Can I have that answer back?

5           (The answer was read back by Madam Reporter.)

6    BY MR. CARBIN:

7        Q    Do you know if anybody from the Christensen camp

8    secured St. Paul's agreement before Former Judge Scott was

9    picked as a mediator?

10          MS. CARR:  Objection, asked and answered.

11          THE WITNESS:  Same answer I just gave you.  Her

12          - her conduct implies that she consented, she sent

13          Bruce Wade.  The mediation couldn't go forward if she

14          didn't send him, because we would be in violation of

15          the local rule.  So if she didn't want us to use

16          Judge Scott, she could have withheld Bruce Wade from

17          the mediation.

18    BY MR. CARBIN:

19        Q    Have you ever seen the insurance policy between

20    St. Paul and Christensen?

21        A    I may have seen it when St. Paul filed the

22    lawsuit in Fort Lauderdale and violated the

23    confidentiality of the settlement agreement.

24        Q    Prior to the filing of the declaratory judgement

25    action in Florida, had you seen the Christensen/St. Paul

objection
FRE 401
402
403

CONFIDENTIAL

Page 34

```
 1    insurance policy?

 2          A    I don't think so.

 3          Q    Let's turn back to the fall of 2004, at about

 4    the time your office was retained.  Prior to filing an

 5    answer or the motion to dismiss, was there some effort to

 6    try to settle between Christensen and Woods?

 7          A    Yes.

 8          MS. FOLEY:  Intervenors designate all testimony

 9          about settlement discussions as confidential.

10    BY MR. CARBIN:

11          Q    Did you have any discussions with anybody from

12    the Woods' camp about settlement?

13          A    Yes.

14          Q    Who did you speak with?

15          A    Doug Baldridge

16          Q    Who initiated that settlement dialogue?

17          A    I don't think anyone initiated, we were speaking

18    after a deposition and -- no, I had my year wrong.

19               We're back when the lawsuit was first filed?

20          Q    We're back in the fall of '04, correct.

21          A    Yes.  There were discussions right around -

22    well, there were discussions that I have knowledge of that

23    I did not participate in.

24          Q    Okay.

25          A    Right at that time.
```

*Speculates.*
*No Personal Knowledge*

1    Q    And what did you learn about settlement

2    discussions during that period?

3    A    I learned that when the lawsuit was first filed,

4    Casey Marshall and Doug Baldridge spoke that one of the

5    reasons we agreed to enter into a consent preliminary

6    injunction, against the advice of Judge Zloch, was Casey

7    understood from Doug Baldridge that that would go a long

8    way to make the case go away; and that about three or four

9    weeks later, when I was -- I was involved in the

10    conversation with Casey, Doug and myself on the phone.

11    Q    This is still '04?

12    A    This is - the preliminary injunction was

13    November 9th or 10th, '04.  This is probably the week

14    after Thanksgiving '04, where Doug Baldridge raised the

15    payment of millions of dollars to Tiger Woods and we got

16    Doug Baldridge off the phone and Casey said, that's a

17    complete reversal from what he told me before the

18    preliminary injunction hearing.  The main reason we

19    accepted the preliminary injunction was because it would

20    get us out of the case quickly.

21         There was talk of giving - of extending the

22    Woods' warranty on the boat for the next year or two,

23    whatever that meant in terms of goodwill towards the

24    Woods, but never the payment of a seven figure settlement

25    amount.  And at that point the settlement discussions

CONFIDENTIAL

1    basically broke down for - or didn't exist for another

2    year.

3        Q    As far as you were aware of?

4        A    As far as my involvement was concerned in - in

5    settlement talks.

6        Q    Who was it that recommended against agreeing to

7    the preliminary injunction?

8        A    Judge Zloch, the judge overseeing the case

9    questioned whether we were sure we really wanted to enter

10    into a consent preliminary injunction matter.

11        Q    Did he give a reason why he questioned that?

12        A    In my read of the transcript is, he didn't think

13    they had the strongest of cases.

14        Q    They not having the strongest of cases being the

15    Woods camp?

16        A    There was only one party that had the case at

17    the time of the preliminary injunction hearing.

18        Q    With respect to the settlement dialogue, were

19    you aware of any proposal about a meeting in Florida?

20        MS. CARR:  Objection, vague.

21    BY MR. CARBIN:

22        Q    In the fall of '04.

23        A    Between or among who?

24        Q    Between the Woods camp and the Christensen camp.

25        A    Yes.  During the conversation, I believe Casey

1    offered to have Joe Foggia fly to Florida and meet with,

2    probably, Chris Hubman to see if the matter could be

3    resolved.  He - he offered to make Joe available for a

4    settlement meeting if - if - if Doug thought it would

5    further - it would help facilitate a settlement.

6         Q    Who is Janet Moreira?

7              MS. CARR:  Objection, asked and answered.

8              THE WITNESS:  The same associate I identified as

9         having attended the preliminary injunction hearing

10        with Leslie Lott.

11   BY MR. CARBIN:

12        Q    What was her role in the Woods/Christensen

13   litigation?

14        A    She was my associate assisting me in the

15   defense.

16        Q    The preliminary injunction, do I understand

17   correctly that that was entered on consent?

18        A    Yes.

19        Q    Did you have any communication with anybody from

20   St. Paul prior to it consenting to the entry of that

21   preliminary injunction, about the consent?

22        A    Not personally.  I wasn't - I wasn't around for

23   that.

24        Q    Are you aware of anybody from your office that

25   discussed with St. Paul consenting to the entry of a

CONFIDENTIAL

1  preliminary injunction?

2      A    I don't even know if St. Paul was involved at

3  that point in time.

4      Q    Was that a no?

5      A    It's an I don't know.  My office didn't tender

6  the claim to St. Paul, I assume Casey Marshall did, and I

7  don't know when it was tendered.  But the - I think the

8  papers were served the 4th or 5th of November, and the

9  hearing was like - it was like two or three days later.

10     Q    Is it your understanding that Mr. Marshall was

11 the primary contact on behalf of Christensen with

12 St. Paul?

13     A    I have no idea.

14     Q    Was your office the primary contact with

15 St. Paul for Christensen?

16     A    On the Woods' matter?

17     Q    Yes.

18     A    I don't believe so.

19     Q    Did you have a conversation with Mr. Marshall

20 concerning the selection of your firm as defense counsel

21 for Christensen and having your firm approved by St. Paul?

22     A    No.  We already - we were hired and had already

23 appeared at the preliminary injunction hearing.  By the

24 time I returned from getting married and my honeymoon, I

25 was aware that we were working on the case.

a5473d01-29c3-4e82-b915-07e37edd9ecc

CONFIDENTIAL

Page 39

1          I got the initial call, I don't recall from

2    whom, on the golf course the day before my wedding and I -

3    I handed it off to my partner, Leslie Lott, who handled

4    the preliminary injunction hearing on our behalf.  And

5    then when I returned from my honeymoon, I assumed the lead

6    within our firm on the matter.  By that - by the time that

7    I came back from my honeymoon, we had been hired, St. Paul

8    had approved us as counsel, and we were working with Casey

9    and Joe on the defense of the matter.

10         Q    That's what I wanted to talk about.  The

11   approval of your firm by St. Paul, what was your

12   understanding of what that - why their approval was

13   needed?

14              MS. CARR:  Object to the form.

15              THE WITNESS:  I didn't have an understanding of

16   why the approval was needed.  I had an understanding

17   that Christensen had submitted the lawsuit to

18   St. Paul for coverage and that St. Paul had approved

19   Lott & Friedland as defense counsel for Christensen

20   in the matter

21         I - I don't practice insurance law.  I know that

22   in the type of cases that my office works on, there

23   are situations where coverage is available.  I know

24   that we always recommend to clients who get sued in

25   Lanham Act claims, L-A-N-H-A-M, to check their -

CONFIDENTIAL

1          Do you recognize this letter as one issued by

2    your office?

3        A    Yes.

4        Q    And what was the purpose of this letter, to your

5    understanding?

6          MS. CARR:   Objection.   The letter speaks for

7          itself.

8          THE WITNESS:   As I just testified, when we have

9          Lanham Act claims come in our office that are for

10         clients who have been sued under the Lanham Act,

11         they're defendants in a Lanham Act case, we have a

12         standard form letter that we send to the client that

13         advises them of the possible availability of

14         insurance coverage under the advertising injury

15         clause of many general insurance policies.  And this

16         was our office sending that letter to Christensen,

17         because a Lanham Act claim had been asserted against

18         Christensen and this is a standard letter we send out

19         in all such cases.

20    BY MR. CARBIN:

21        Q    Did anyone from your office ever review the

22    policy issued by St. Paul for Christensen for coverage, as

23    far as you know?

24        A    I know for a fact, we didn't.

25        Q    Do you know if the policy issued by St. Paul to

CONFIDENTIAL

Page 42

```
 1    Christensen had any provision in it concerning a duty to

 2    cooperate?

 3              MS. CARR:  Objection, foundation.  He just

 4         testified that nobody in his office reviewed the

 5         document.

 6              THE WITNESS:  I've - I've -- other than

 7         believing that the policy was attached as an exhibit

 8         to the DJ action that your client filed against

 9         Christensen in May of '06, I have never read the

10         policy.

11    BY MR. CARBIN:

12         Q    Did you ever learn that the policy had any

13    provision in it that placed a cooperation obligation upon

14    Christensen?

15              MS. CARR:  Object to the form.

16              THE WITNESS:  Formally, no.

17    BY MR. CARBIN:

18         Q    What does that mean, formally no?

19         A    It's - it is my practice when insurance carriers

20    are involved in a client's matter to try and keep the

21    insurance carrier in the loop; is that formally abiding by

22    a cooperation clause, I don't know.  Is that what we do,

23    either when we're asked by the client or based on our

24    practice and experience, yes.

25              So I didn't know, I never saw the policy, didn't
```

*[handwritten margin note: "ST plfn objects, lacks personal knowledge"]*

CONFIDENTIAL

1    know if it had a duty to cooperate clause that you

2    referred to.  But I know that as a practice  when there

3    are insurance companies involved, because they're, number

4    one, representing the client, number two, often times

5    paying our bills, that we work to keep them in the loop.

6        Q    Did you understand that St. Paul was going to be

7    paying your bills for the defense of Christensen in the

8    Woods' litigation?

9        A    No, not at first.

10       Q    When did you learn that?

11       A    When they started paying our bills which was, I

12   believe, about 15 months into the litigation.

13       Q    When you say paying your bills, you mean paying

14   them directly to you?

15       A    Correct.

16       Q    Is it fair to say that all of your bills for the

17   defense of Christensen in the Woods' litigation have been

18   paid?

19       A    Yes.

20       Q    Now, we spoke about some awareness you had

21   concerning settlement discussions towards the beginning of

22   the case in 2004.  After that period, did you have -- and

23   leaving the mediation aside -- did you have any

24   involvement in any settlement dialogue between the Woods

25   and Christensen's camps?

CONFIDENTIAL

1    A    Yes.

2    Q    When was that?

3    A    In November '05.

4    Q    What happened in November '05?

5    A    Again, you're interrupting my answer.

6    Q    I didn't mean to, you hesitated.  I thought you

7    were done.  I'm sorry.

8    A    In November '05, we attended a third-party

9    deposition of Jill Bobrow in Vermont, and at the end of

10   the deposition, we were talking about all the upcoming

11   depositions.  We, being Baldridge, Wampold and myself, in

12   the lobby of the hotel where the deposition was taken.

13         MS. CARR:  Danielle, would you mind putting that

14   on mute?

15         MS. FOLEY:  I'm sorry.

16         MS. CARR:  Would you mind putting that on mute

17   so we can't hear you type?

18         MS. FOLEY:  I'm sorry, I thought it was on mute.

19         THE WITNESS:  Following the deposition in the

20   hotel - the deposition was taken in a hotel.  Mike,

21   Doug and I were looking at calendars and scheduling

22   depositions and the issue of settlement came up.  And

23   Mike or I or both of us said, find a time and a date

24   that Chris and Joe can meet.  And, basically, it

25   tried to pick up from where we had left off when

CONFIDENTIAL

Page 45

```
 1        Casey and I spoke with Doug the prior year, basically
 2        saying we'll extend the warranty, we'll make a public
 3        statement, and we'll go from there.  And Doug said
 4        he'll take it back to his client, and we said we'd
 5        take it back to our client, which really meant just
 6        us getting Joe to agree to come to a meeting.
 7   BY MR. CARBIN:
 8        Q    Joe Foggia?
 9        A    Yes, sir.  And that was really the extent of it.
10   We were all, everyone was leaving to go to the airport to
11   get their flights, but we said we wanted to reopen the
12   possibility of settlement discussions.
13             MS. CARR:  Again, Intervenors designate all
14        testimony about settlement discussions as
15        confidential.
16   BY MR. CARBIN:
17        Q    And you mentioned Chris; would that be Chris
18   Hubman?
19        A    Yes, it would.
20        Q    Did you stay with Mr. Wampold and Mr. Baldridge
21   throughout that evening before you got on your flight?
22             MS. CARR:  Objection, vague.
23             THE WITNESS:  No.  We went to the airport, I
24        think we went to the airport together and I think
25        they were -- I was flying home and they were flying
```

CONFIDENTIAL

1    on track here.

2            We were talking about the settlement discussion

3    you had with Mr. Baldridge and Mr. Wampold following the

4    deposition of Mr. Bobrow in Vermont, November of '05.  Did

5    you report that discussion to St. Paul?

6        A    Yes.

7            MS. CARR:  Objection, asked and answered.

8            Sorry, please let me get the objection in.

9    BY MR. CARBIN:

10       Q    Who did you report to at St. Paul?

11       A    There is only one person I ever spoke to at

12   St. Paul outside of the mediation.

13       Q    That was Mrs. Zeller?

14           MS. CARR:  You need to give a verbal answer.

15           THE WITNESS:  That wasn't a question, that was a

16   statement.  That was Mrs. Zeller is not a question.

17   If he wants to say, was that Mr. Zeller, I'm happy to

18   answer the question.  Since we can now play these

19   games, we'll play the games.

20   BY MR. CARBIN:

21       Q    I'll adopt that question.

22       A    Yes.

23       Q    Do you recall what you told Mrs. Zeller?

24       A    Verbatim, no.

25       Q    What do you recall that you told Mrs. Zeller?

CONFIDENTIAL

1        A.     That we spoke, the attorneys spoke about the

2    clients meeting for settlement purposes.

3        Q      Do you recall telling her anything else?

4        A      Not specifically.

5        Q      Did you make a note of that conversation with

6    Mrs. Zeller?

7        A      Probably not.

8        Q      Was there anybody else on the call aside from

9    you and Ms. Zeller?

10       A      Unless you were listening, no.

11              THE WITNESS:  I'm going to take a break now.

12              (A brief recess was taken.)

13              MR. CARBIN:  Let's go back on.

14    BY MR. CARBIN:

15       Q      Do you recall any response from Mrs. Zeller when

16    you spoke to her in the fall of '05 following this

17    discussion about settlement in Vermont?

18       A      Nothing more specific than she asked me to keep

19    her updated and to let her know if the meeting ever

20    actually took place.

21       Q      Did anything come of that discussion that you

22    had with Mr. Baldridge in Vermont, in terms of further

23    settlement dialogue?

24       A      Case settled.

25       Q      Well, I'm talking about the - you had a

CONFIDENTIAL

Page 52

1    discussion, I think you said with Mr. Wampold and

2    Mr. Baldridge, in November of '05.

3        A    And the case settled in April of '06.

4        Q    Do I understand correctly from your comment that

5    there was a continuing dialogue from November of '05, up

6    until April of '06?

7        A    Depends what you mean by continuing.

8        Q    Well, some regular back and forth about the

9    potential to settle.

10       A    I would say so.  Joe Foggia attended the Woods'

11   depositions.  I believe he and Chris Hubman spoke at that

12   time or it may have been at his own deposition, I don't

13   recall.  But Chris Hubman was deposed in the same location

14   as Tiger Woods and his wife, which was Tiger's personal

15   offices in Orlando and Joe was present and he and Chris

16   spoke, he and Chris Hubman spoke at those depositions.

17   And then a month later, we mediated and settled.

18       Q    When you say Chris and Joe Foggia spoke, was

19   that a personal meeting that they spoke at?

20           MS. CARR:  Objection, form; vague.

21           THE WITNESS:  As opposed to?

22   BY MR. CARBIN:

23       Q    On the phone or teleconference.

24       A    You mean was it in person?

25       Q    Yes.

ROSENBERG & ASSOCIATES, INC.        (973) 228-9100
www.rosenbergandassociates.com
a5473d01-29c3-4e82-b915-07e37edd9ecc

CONFIDENTIAL

1    Christensen?

2        A    No.

3        Q    Okay.  How did you communicate with Christensen

4    about the progress of the case and how their exposure or

5    defenses were looking?

6        A    Phone, email, in person, maybe fax, maybe

7    letter, pretty much any way that an attorney can

8    communicate with his client.

9        Q    And were you communicating directly with

10   Mr. Foggia about the developments in the litigation and

11   your analysis of them?

12       A    Not exclusively.

13       Q    Following the denial of the motion to transfer

14   up until the time of the mediation, as best you can, how

15   frequently were you communicating with Christensen camp

16   about developments in the case and where you saw it going?

17       A    I can't answer the question, because I don't

18   know what you mean by developments in the case and where I

19   saw it going.

20           I communicated with Casey Marshall, Joe Foggia,

21   others in Christensen's offices, probably pretty close to

22   daily during this litigation.  It was not always about the

23   developments in the case or where I saw it going.  It may

24   have been, I need to see a document.  It may have been,

25   are you guys available on this time and date.  It may have

ROSENBERG & ASSOCIATES, INC.          (973) 228-9100
www.rosenbergandassociates.com

CONFIDENTIAL

1  been, full-fledged strategy.  But for a good four to six

2  month period, I would guess that in some form or another,

3  I spoke to somebody involved in this litigation on our

4  side eight out of every ten days, business days.

5        Q    After the discussion you had with Mr. Wampold

6  and Mr. Baldridge in November of '05 concerning the

7  potential of settlement, and prior to the mediation, were

8  you involved in any further discussion about settlement?

9            MS. CARR:  I am sorry.  Could you just --

10            THE WITNESS:  With whom?

11            MS. CARR:  I was going to ask her to read it

12    back.

13  BY MR. CARBIN:

14        Q    With the Woods camp.

15        A    Yeah.  I think every time I spoke to Doug

16  Baldridge, we said - he or I talked about the possibility

17  of getting the case settled one way or the other.  Nothing

18  specific that I can recall but, is the meeting going to

19  happen between our clients.  And obviously, every time I

20  spoke with Ben Kuehne or Doug about a mediator, I was

21  talking about settlement of the case.

22            But the - I - I would say that the lawyers

23  involved all understood that because of the issues

24  involved in the case, this was a case that primarily would

25  be settled by the clients reaching some sort of an

a5473d01-29c3-4e82-b915-07e37edd9ecc

CONFIDENTIAL

Page 56

1  understanding that would let them put it behind them.  And

2  until we could set up a meeting, which wasn't going to be

3  Tiger Woods, but it was going to be Chris Hubman and Joe

4  Foggia or Dave Christensen, that the case wasn't going to

5  be settleable.

6          So, basically the sum and substance of my

7  discussions with Doug would have been, are we going to get

8  the clients together; when can we can get them together;

9  where can we get them together; things along of that

10  nature.

11      Q      Was it important to get the clients together to

12  se if a settlement could be achieved because of

13  non-monetary concerns?

14      A      The best --

15          MS. CARR:  Objection, vague.

16          Go ahead.

17          MS. FOLEY:  I'll just interrupt and designate

18  again all questions regarding settlement discussions

19  are confidential, including the previous two answers.

20          THE WITNESS:  I would say because of the manner

21  in which the lawsuit arose, namely, Tiger Woods' wife

22  seeing what she thought were offensive uses of her

23  bedroom and her boat at the Fort Lauderdale Boat

24  Show, that the lawyers getting together and talking

25  about how to get the case settled wasn't going to

CONFIDENTIAL

Page 57

1    satisfy Tiger Woods, necessarily - his wife,

2    definitely.  And it was going to be important for

3    Mrs. Woods, personally and Tiger Woods, on behalf of

4    his wife, to hear some sort of a concession from

5    Christensen.  Does that mean it's not monetary,

6    that's not for me to say.

7         For instance, giving them a two or three year

8    extension of their warranty, even though Christensen

9    is not writing a check, there is a monetary value to

10   that, because they're going to get free parts and

11   service on their boat for an extra two years or

12   whatever it may have been.

13        So, yeah, there is a monetary component to it,

14   but there was also a personal component to it because

15   of the nature of Mrs. Woods learning of the allegedly

16   offensive conduct and how she wanted to be - how it

17   was perceived that she wanted to be made whole.

18   BY MR. CARBIN:

19        Q    And this personal character to any potential

20   resolution, is that something that was brought up by

21   Mr. Baldridge?

22        A    In part.

23        Q    Did Mr. Baldridge indicate that an apology would

24   be needed for resolution to figure out that?

25             MS. CARR:  Objection, vague as to time frame.

CONFIDENTIAL

Page 58

1          THE WITNESS:  At some point in time, an apology

2     was brought into the mix.

3          I don't think the mediation was the first time I

4     recall hearing about an apology.  But I don't think

5     an apology was brought up back in November of '04,

6     when Casey and I spoke with Doug Baldridge or,

7     necessarily, in November of '05, when Mike and I

8     spoke in person with Baldridge.  But at some - at

9     some juncture, an apology came into the mix.

10    BY MR. CARBIN:

11         Q    Okay.  You say you don't think an apology was

12    raised in October '04.  Do you recall with certainty one

13    way or the other, whether an apology was raised in October

14    '04?

15         A    It wasn't October '04, because the lawsuit

16    wasn't even filed until November of '04.  I said November,

17    you said October.

18         Q    Excuse me.  You're right, I misspoke.

19         Do you recall with any certainty whether an

20    apology was raised in the fall of '04 or not raised?

21         A    I don't recall with certainty.

22         Q    Do you recall about any degree of certainty,

23    whether the issue of an apology was raised in the fall of

24    2005 or not raised?

25         A    During the discussions in Vermont?

a5473d01-29c3-4e82-b915-07e37edd9ecc

CONFIDENTIAL

Page 60

```
 1              (Friedland Exhibit 152 was marked for

 2              identification.)

 3      BY MR. CARBIN:

 4          Q    Look at Exhibit Friedland 152, sir.  Do you

 5      recognize what these are?

 6              MS. CARR:  Obviously, take your time with it.

 7              THE WITNESS:   Is this the same document you just

 8      showed me?

 9      BY MR. CARBIN:

10          Q    No, it isn't.  I believe it's a different set of

11      notes.

12          A    They're two pages of notes,  ppear to be written

13      by Leslie Lott dated November 17th of '04.

14          Q    If you could draw your attention to the top of

15      the second page, and the second line there, I think it's a

16      bullet point, and if I am reading it correctly -- tell me

17      if you think I'm reading it wrong, you're more familiar

18      with this handwriting.

19              I believe it says, "Mutually agreed to cancel

20      settlement discussions."  Do I appear to have read that

21      right?

22          A    You mean, are you reading her handwriting

23      correctly?

24          Q    Yes.

25          A    Is that what you're asking me?
```

Hearsay,
lack of
foundation,
lack of
personal
knowledge

```
 1        Q     Yes.
 2        A     It appears so.
 3        Q     Do you know what is referred to here, when it
 4   speaks to mutually agreed to cancel settlement
 5   discussions?
 6        A     Yes, because the line below says November 15th
 7   Baldridge said he will not meet without settlement
 8   proposal, 1 million to $20 million demand.  Do you see
 9   that?
10        Q     And when it talks --
11        A     Do you -- do you see that?
12        Q     When it talks about mutually agreed, is that
13   mutual in reference to Christensen and Woods?
14        A     The - on November 15th, Doug Baldridge, Casey
15   Marshall and I spoke on the phone about settlement, that
16   was the conversation I had referenced previously.  Where
17   Casey was incensed because Doug had said if you consent to
18   the preliminary injunction, it will go a long way towards
19   getting the case settled.
20              On November 15th, the three of us got on the
21   phone and Doug said, we're not going to have a settlement
22   meeting unless we know for sure you're going to come up
23   with at least a seven figure settlement demand - proposal
24   and Casey said, well, I guess we're not speaking - talking
25   settlement for a while.
```

CONFIDENTIAL

Page 68

1    A    Carol Williamson and Associates, which was a

2    defendant at the time, I believe.

3    Q    Did you or anyone from your office ever speak to

4    St. Paul to get their agreement to enter into this

5    protective order before it was agreed to?

6         MS. CARR:  Objection, foundation-less as to

7         those individuals from his office.

8         THE WITNESS:  Probably not.  This is not the

9         sort of - what I consider ministerial litigation

10        document that would require the insurance company's

11        input.

12             We were protecting confidential documents of the

13        parties, namely Tiger Woods, primarily, and

14        Christensen also; and the insurance company was not a

15        party to the action, it would have no need to protect

16        its proprietary information.

17   BY MR. CARBIN:

18        Q    Were there any discussions amongst the

19   Christensen camp about whether or not this protective

20   order should be agreed to?

21        MS. CARR:  Objection, form; overbroad; lack of

22        foundation with respect to the conversations he may

23        or may not - or he was not a part of.

24        THE WITNESS:  He, including Casey Marshall and

25        the Christensen camp?

CONFIDENTIAL

Page 76

1    A    No.

2    Q    I'm not giving you a headache, am I?

3    A    Uh-huh.  Yes, you are.

4    Q    Look, if you would, at what is marked Friedland

5    Exhibit 154.  Do you recognize what this is?

6    A    Janet Moreira's han written notes of a telephone

7    conference of November 22nd, '04, at 6:15 p.m. with you.

8    Q    And obviously, it refers to the fact that I

9    identified myself as coverage counsel for St. Paul; do you

10    see that?

11    A    It says coverage counsel for St. Paul.  She may

12    have done some research and found out, but I'll give you

13    the benefit of the doubt that you identified yourself as

14    coverage counsel.  You don't want me assuming.

15    Q    No, I don't.  I don't know how else she would

16    have known.

17    A    She could have Googled you.

18    Q    I'm sure you did.

19    Dropping down to the last line, it says:  He

20    wants to get copies of pleadings; do you see that?

21    A    Yes.

22    Q    Do you know if the pleadings were ever sent to -

23    any pleadings were ever sent from your office to me?

24    A    Since you asked - asked the question, I'll say

25    no, I don't know.

*[handwritten margin note: St Paul objects, hearsay, 401, 402, 403]*

CONFIDENTIAL

Page 78

1    say, your office had not sent my office any pleadings,

2    would you have any basis to dispute that?

3         A    I'll bite my tongue and say, no.

4              MS. CARR:  Also objection to foundation.  He

5         says he doesn't know whether they sent the pleadings,

6         he certainly can't say one way or the other whether

7         he could object to Mr. Carbin's statement or not.

8              (Friedland Exhibit 155 was marked for

9              identification.)

10   BY MR. CARBIN:

11        Q    Mr. Friedland, look at what we've marked as

12   Exhibit Friedland 155, if you would.  Do you recognize

13   what this is?

14        A    Yes, sir.

15        Q    And what is it?

16        A    Notes of a telephone conversation that Janet and

17   I had with Casey Marshall on the 24th of November, 2004.

18        Q    And am I reading that as 10:48 a.m.?

19        A    I'd say 10:18, but not sure.

20        Q    And did the subject of settlement come up during

21   that conversation?

22        A    It appears to have.

23        Q    All right.  And did Mr. Marshall indicate that

24   he was still talking to Mr. Baldridge about settlement at

25   this time?

*[handwritten margin note: Hearsay 401 402 403]*

CONFIDENTIAL

Page 86

```
 1       A    Sir, you can read this a sentence at a time.  I
 2  already said this is my email.
 3       Q    Prior to this email of February 1, 2005, when is
 4  the last time you had any discussion directly with
 5  Ms. Zeller?
 6       A    You want me to guess?
 7       Q    No, please don't guess.
 8       A    I can give you an answer based on activity in
 9  the case.
10       Q    If you have a memory, that's fine.
11       A    It was around the same time that we filed our
12  motion to dismiss and the Seattle firm was hired to handle
13  the declaratory judgment action in Vancouver, Washington.
14       Q    And if I recall correctly, that would have been
15  in the fall of '04; is that right?
16       A    No.  That would have been December, sometime in
17  December of '04, so probably within -- this is
18  February 1st, within three to five weeks of the date of
19  this email exchange.
20       Q    Looking at this email of yours, February 1,
21  2005, 11/17, you write:  "I don't think an insurance
22  company should have any role whatsoever in deciding
23  litigation strategy for our client..." the sentence
24  continues, but I want to stick with that language.
25       A    Then you're reading the sentence out of context
```

CONFIDENTIAL

1    Q    Why was it your view that an insurance company

2    should not have any role whatsoever in deciding litigation

3    strategy for a client?

4    A    It wasn't my view.  It was my opinion.

5    Q    Why did you have that opinion?

6    A    Because my client was Christensen.  Casey

7    Marshall was the outside general counselor at Christensen,

8    and I was expressing to him that I thought Christensen and

9    its lawyers should be making the decisions, and then I

10   added to that sentence, but let me know if you feel

11   otherwise.  So, if he had knowledge of requirements under

12   the insurance policy that would give St. Paul the right to

13   tell me what to do or how to do it, he should let me know.

14   Q    Is it still your opinion that an insurance

15   company should not have a role in deciding litigation

16   strategy for a client?

17   A    I don't know.  I haven't been faced with that

18   opinion - with that issue.

19   Q    When did you develop that opinion?

20   A    I don't know.

21   Q    Did you develop that opinion before you wrote

22   this February 1, 2005 email?

23   A    It would be hard to express an opinion in

24   writing before it had been developed, so obviously.

25   Q    What is the basis of your opinion that an

CONFIDENTIAL

Page 88

```
 1    insurance company should not have a role whatsoever in
 2    deciding litigation strategy for a client?
 3              MS. CARR:  Object to the form.
 4              THE WITNESS:  I don't know if there is a basis.
 5         I'm a patent and trademark lawyer, not an
 6         insurance lawyer.  I was giving my two cents for
 7         whatever they were worth.
 8    BY MR. CARBIN:
 9         Q    What would the downside of an insurance company
10    being involved in deciding litigation strategy for a
11    client be?
12              MS. CARR:  Objection, foundation.
13              THE WITNESS:  I don't know.  I don't know,
14         that's what you do --
15              MS. CARR:  Calls for speculation.
16              THE WITNESS:  Sorry.
17         That's what you do for a living, not what I do
18         for a living.  You would know that better than I.
19    BY MR. CARBIN:
20         Q    You think that an insurance company should not
21    have a role in deciding litigation strategy for a client,
22    even where the insurance company is paying for the legal
23    defense?
24         A    I don't believe that the fact that you're -- I'm
25    sorry.
```

CONFIDENTIAL

Page 89

1    MS. CARR:  I was just thinking.  You just asked

2    what he thinks.  Go ahead, please.

3    THE WITNESS:  I don't think the fact that the

4    insurance company may be paying for a legal defense

5    gives the right for the insurance company to dictate

6    the strategy.

7    BY MR. CARBIN:

8    Q    Does it give the insurance company a right, in

9    your opinion, to be involved in deciding what the strategy

10   should be?

11   A    No.

12   Q    Do you think that the fact that the insurance

13   company is paying for the defense and paying the legal

14   fees of your firm creates any obligation and

15   responsibility on your firm's part in terms of reporting

16   to the insurance company?

17   MS. CARR:  Objection, vague.

18   THE WITNESS:  Only to the extent that my client,

19   who is my responsibility legally and ethically,

20   desires that I do so.

21   BY MR. CARBIN:

22   Q    So is it fair to say that whatever reporting you

23   would do to the insurance company in this case, St. Paul,

24   would be predicated upon instructions you got from your

25   client?