CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

RECEIVED
AUG 1 3 2007
LANE POWELL PC
TIME _____ ATTY _____

CHRISTENSEN SHIPYARDS, LTD., )
a Washington Corporation, )
                           )
            Plaintiff, )
                           )
       vs.                 )      CASE NO. CV6641
                           )
ST. PAUL FIRE AND MARINE   )      **CONFIDENTIAL**
INSURANCE COMPANY, a foreign )
corporation and NAVIGATORS )
INSURANCE COMPANY, a foreign )
corporation,               )
                           )
            Defendants.    )
_____X

200 South Biscayne Boulevard
Miami, Florida
Tuesday, May 22, 2007
9:35 o'clock a.m.

DEPOSITION OF: JAN ERIC PETERSON, ESQ.

ROSENBERG & ASSOCIATES, INC.

Certified Shorthand Reporters & Videographers

425 Eagle Rock Avenue - Suite 201

Roseland, New Jersey 07068

(973) 228 - 9100

www.rosenbergandassociates.com

1    background questions and do some of my housekeeping, if
2    you will.
3           We have on the phone Ms. Foley, who's counsel
4    for the Intervening Woods' interest, and you may hear her
5    pipe in on occasion designating certain testimony
6    confidential and don't be surprised by that.
7           Would you tell us your full name, please.
8    A    Jan Eric Peterson.
9    Q    And your home address?
10   A    2133 East Interlaken Boulevard, Seattle,
11   Washington.
12   Q    I understand you also have a residence in
13   Florida; is that right?
14   A    Yes.
15   Q    What is that address?
16   A    4100 Galt Ocean Drive, Number 108, Fort
17   Lauderdale, Florida.
18   Q    During the period - what time of year do you
19   spend at each address, if you have a set schedule?
20   A    I don't; but generally, the winter in Florida.
21   Q    I think we heard off the record that you're
22   going back to Seattle for the season tomorrow.
23   A    That's correct.
24   Q    And do you have any plans as to how long you're
25   going to stay there?

CONFIDENTIAL

Page 8

1      A    Yes.

2      Q    How was that?

3      A    I went to law school with a fellow named Dennis

4  Lane who was in the law firm that represented Christensen

5  in their business interest.

6      Q    Mr. Lane, I understand, is a partner of

7  Mr. Marshall.

8      A    Yes.

9      Q    Who was it that contacted you?

10      A    Dennis Lane, initially, and then Mr. Marshall.

11      Q    In terms of your reporting to Christensen or the

12  Christensen representatives on the case, who was your

13  point of contact?

14      A    Reporting?

15      Q    Yeah, who would you talk to -- I'll rephrase it

16  for you.

17          Who was your primary contact for Christensen in

18  terms of talking to them about the case?

19      A    Well, initially it was Casey Marshall, their

20  counsel.  And then - then the primary contact, I believe,

21  subsequent to that was Joe Foggia, president of the

22  company.

23      Q    When did that shift occur?

24      A    That was in the beginning.

25      Q    What --

CONFIDENTIAL

Page 13

1      Q   Are you aware that St. Paul requested to be

2  involved in any strategic decisions on the case?

3        MS. CARR:  I'm going to object to the form.

4        THE WITNESS:  I don't recall.

5  BY MR. CARBIN:

6      Q   Have you ever seen the insurance policy issued

7  by St. Paul to Christensen?

8      A   I don't know.  I don't recall and I'll tell you

9  that.

10     Q   Do you recall ever having any discussions about

11  what the insurance policy provided for?

12        MS. CARR:  Objection, vague as to timeframe.

13        THE WITNESS:  I must have been apprised of what

14  the policy's limits were, I'm sure I was.

15  BY MR. CARBIN:

16     Q   Who apprised you of that?

17     A   Probably Mr. Marshall, but I don't recall.

18     Q   Do you recall a Mr. Lane, Mr. Marshall's

19  partner, ever speaking with him about the limits on the

20  policy?

21     A   No.

22     Q   When you say the limits on the policy, what are

23  you referring to?

24     A   The amount of money the policy provided in

25  coverage.

CONFIDENTIAL

1    A    Not often, so I...

2    Q    What is not often?

3    A    I don't know.  But you - you said a dozen and I

4  said it's probably less than that.  It's more than one,

5  it's less than a dozen, beyond that, I would be purely

6  guessing.

7    Q    What is -- withdrawn.

8         What was your personal role in the defense of

9  Christensen?

10    A    What do you mean?

11    Q    In terms of the defense that was provided to

12  Christensen --

13    A    Yes.

14    Q    -- in the Woods' litigation, what tasks or role

15  did you assume individually?

16    A    Well, we - we work as a team, first of all.  And

17  so I was involved in discussions, strategy, decisions.

18  Certainly kept abreast of developing - developments in the

19  case, facts in the case, the documents in the case, what

20  work was being done in the case.  I attended depositions.

21  I took Mr. Woods' deposition, and was prepared to be the

22  lead trial counsel when the case went to trial.

23    Q    Aside from --

24    A    So there is some of the things I did.

25    Q    Do you recall any other things that you did?

CONFIDENTIAL

Page 23

1       Q    Do you recall when you first became involved,

2   and I think we have seen that it's sometime in late 2004,

3   which is when the motion to transfer was made.

4            Do you recall any settlement exchanges occurring

5   at about the time or shortly after the time your firm was

6   engaged?

7       A    No.

8       Q    Were you ever involved in any settlement

9   discussions in the case?

10      A    Yes.

11      Q    What settlement discussions were you involved

12  in?

13      A    Mediation.

14      Q    Let's leave the mediation aside for a moment.

15  Aside from the mediation, were you involved in any

16  settlement discussions on the case?

17      A    What do you mean by settlement discussions?

18      Q    The parties, Woods, Christensen talking about

19  coming to a resolution of the claim.

20      A    No.

21      Q    Did you ever discuss with the Christensen group,

22  I'll call it, your client, exploring settlement on the

23  case?

24      A    Yes.

25      Q    Who did you have those discussions with?

2099c5de-2020-46e3-a45b-d41395fe9302

CONFIDENTIAL

Page 24

1    A    Certainly Mr. Marshall, Mr. Wampold, myself, at

2    some point Joe Foggia; and although I did not have direct

3    discussions with - Mr. Christensen put the kabosh on any

4    efforts at that point.

5    Q    What point are we talking about?

6    A    This is fairly early on, after the first of the

7    year, I believe -- I could be wrong about that.  Fairly

8    early on there was some discussion about whether this

9    could be resolved and I - I was involved in that

10   discussion.

11   Q    And how did Mr. Christensen put the kabosh on

12   it?

13   A    I don't know, because he didn't have that

14   exchange with me; but I was told subsequently that he - he

15   was adamant at that time.  He wasn't apologizing and...

16   Q    Who did you learn this from?

17   A    I think Mike Wampold.

18   Q    And why was the apology an issue?

19   A    Because we knew from -- I was told that

20   Mr. Baldridge had said at some point in some early

21   deposition that that's what he wanted, among other things,

22   but the - that would be a necessity.

23        MS. FOLEY:  Designate all testimony relating to

24   settlement communications with Mr. Baldridge as

25   confidential.

2099c5de-2020-46e3-a45b-d41395fe9302

CONFIDENTIAL

Page 29

1          THE WITNESS:  I know there was more to it than
2       that, but I just don't recall what.
3    BY MR. CARBIN:
4       Q    Did you ever undertake to consult with St. Paul
5    on any decisions made in the handling of Christensen's
6    defense?
7       A    No.
8       Q    Did you ever undertake to consult with St. Paul
9    concerning any settlement possibility?
10      A    Putting aside the mediation?
11      Q    Yes.
12      A    No.  Not me, personally.
13      Q    Let me show you a copy of what we previously
14   marked as Exhibit Zeller 14.
15      A    Okay.
16      Q    Have you ever seen that before?  Just to be
17   clear, I'll note that it's a letter from St. Paul to
18   Christensen Shipyards dated November 17th, 2004,
19   caption:  Notice of reservation of rights.
20      A    I don't remember whether I've seen this before
21   or not, frankly.
22      Q    Do you recall discussing with anyone that
23   St. Paul had issued this letter to Christensen?
24          MS. CARR:  Objection, asked and answered and
25       subject to form; foundation.

CONFIDENTIAL

1    starting on page 2 of 2.

2          THE WITNESS:   Okay, I've read it.   What was the

3    question again?

4    BY MR. CARBIN:

5      Q    Let's start with a new one.

6      A    Okay.

7      Q    Looking at Wampold Exhibit 70, are the second

8    and third pages the draft letter that you put together?

9      A    Looks like it.

10     Q    And looking at the email on the first page, the

11   second email from the top -- Who is Elizabeth Shoncatz

12   (phonetic)?

13     A    She was a legal assistant in our office.

14     Q    And am I correct this email at December 7, 2005,

15   2:31 p.m. is her forwarding your draft letter to

16   Mr. Marshall?

17          MS. CARR:   Objection.   The document speaks for

18   itself.

19          THE WITNESS:   It appears to be.

20   BY MR. CARBIN:

21     Q    Now, looking at your draft letter -- Well, it

22   appears to be.   Do you think it might be something else?

23          MS. CARR:   Objection, foundation.

24          MR. CARBIN:   When you say it appears to be, is

25   there a question about that?

CONFIDENTIAL

1        MS. CARR:  Objection, foundation.

2        THE WITNESS:  You asked me if there was a

3    question.  I don't know that there is a question

4    about it.  I said it looks like a transmittal email.

5    BY MR. CARBIN:

6        Q    Looking at the draft letter itself, the second

7    page of this exhibit on the bottom of the first page,

8    there is a bullet point.  And by the way, these bullet

9    points are what you're suggesting be considered between

10   Woods and Christensen as the basis of a settlement; is

11   that right?

12       A    Yes.

13       MS. CARR:  Objection.  The document speaks for

14   itself.

15   BY MR. CARBIN:

16       Q    And the third bullet point reads:  Quote, an

17   agreement that for a financial sum (perhaps, approximating

18   the plaintiffs' cost and fees) to be paid by Christensen

19   Shipyards to the plaintiffs, and then it continues, but I

20   want to stick with that language.

21       Where did you get the notion of a sum

22   approximating the plaintiffs' cost and fees?

23       A    This reminds me that that was the suggestion

24   that Mike came away with from Mr. Baldridge from the

25   depositions in Vermont or New York; that he would need to

2099c5de-2020-46e3-a45b-d41395fe9302

CONFIDENTIAL

Page 36

1  - Woods would require an apology and payment of his

2  expenses, that is, attorney's fees and costs incurred in

3  bringing the litigation.

4      Q    Now, in the cover email on page 1 of Exhibit 70,

5  you asked a question of Mr. Marshall:  Quote, do we have

6  any authority from the insurance company to offer any

7  money; do you see that?

8      A    Yes.

9      Q    Did you get an answer to that?

10     A    I don't recall whether we got an answer to that

11 or not.  What I do recall was that Mr. Christensen

12 objected to this whole thing, so that was the end of that.

13     Q    That's the kabosh that you spoke about earlier?

14     A    Right.

15          (Peterson Exhibit 161 was marked for

16          identification.)

17          MS. CARR:  And I'll object to this excerpt from

18      the series of emails, page 1 of 3.

19 BY MR. CARBIN:

20     Q    Mr. Peterson, would you look at what we marked

21 as exhibit - Peterson Exhibit 161, and I'd like to draw

22 your attention to the email at the top of the page.  From

23 Jan Peterson to Casey Marshall, Monday, December 12th,

24 2005 at 9:46 a.m.  Is this an email that you sent?

25     A    Yes.

CONFIDENTIAL

Page 37

1      Q     The re: is draft letter; is that the same letter
2   that we just saw in Exhibit 70?
3            MS. CARR:   Objection, calls for speculation.
4            THE WITNESS:   I don't know.
5   BY MR. CARBIN:
6      Q     Was there some other draft letter that you
7   prepared?
8      A     I don't think so, but I don't know, certainly
9   not - not about settlement.
10     Q     Now, in this email, you appear to be asking
11  Mr. Marshall some questions about the insurance policy.
12     A     Yes.
13     Q     Why were you interested in learning about the
14  insurance policy at this point?
15     A     Well, I think as the email states, I wanted to
16  be reminded.
17     Q     And why are you interested in being reminded
18  about the deductible on the policy and whether it was a
19  wasting policy?
20     A     Well, we were proposing that by the draft
21  settlement letter that some monies be paid to Woods and,
22  of course, the question then would be by who, how much
23  insurance was there to meet that and how much wasn't, and
24  what was the deductible and whether it was a wasting
25  policy seems, to me, were relevant to that question.

2099c5de-2020-46e3-a45b-d41395fe9302

CONFIDENTIAL

Page 38

1  Q    Okay.  What is a wasting policy?

2  A    Again, it's my understanding is that when - out

3  of the liability coverage provided also comes the

4  attorney's fees and costs of defense.

5  Q    Why is that relevant to consideration of what's

6  available under what policy?

7  A    Well, because if it was a wasting policy, some

8  of it has already been spent.

9  Q    Why is the fact that some of it may have been

10  spent relevant?

11  A    Because you know how much you have left.

12  Q    And when you say have left, that's left for

13  either an indemnity payment or for defense?

14  A    Or both, for that matter, yes.

15  Q    And why is it important to know how much you

16  have left for defense?

17  A    Because if you're a client, you want to know

18  what your position is going to be and what's - what it's

19  going to cost you.

20  Q    Why?

21  A    What do you mean why?  Well, I think that's

22  obvious why.  You want to know what's going to come out of

23  your company's funds.

24  Q    You mean after the insurance is used up?

25  A    Right.

CONFIDENTIAL

Page 39

1    Q    And is that a factor that the client would have

2    to consider in evaluating the value of the case?

3    A    Not in evaluating the value of the case, but in

4    evaluating a disposition or settlement, certainly.

5    Q    And how would that go into evaluating the

6    disposition of settlement of a case?

7    A    This is referring to my draft letter.  The draft

8    letter talks about paying Mr. Woods' attorney's fees and

9    costs, which I don't believe we knew what those were at

10   that point.

11   Q    The draft letter being what's attached to

12   Exhibit 70?

13   A    Right.  And so before the client could make any

14   decision about that, it seems, to me, that I wanted to

15   know what the insurance - be reminded of what the

16   insurance situation was.  I just didn't - obviously, I

17   didn't recall.

18   Q    Well, you point out that this email is asking

19   for a reminder.

20   A    Well that's the word I used, yes.

21   Q    Okay.  Indicating that you had - had some

22   information about the insurance policy previously.  Do you

23   recall when, prior to this date, December 12th, 2005, you

24   first learned about the insurance policy and the coverage?

25   A    I don't.  I don't recall.

CONFIDENTIAL

Page 40

1        Q    Would it be fair to say that during this time

2    period, 2005, when you're asking questions about the

3    insurance policy, this would also be the general timeframe

4    when you learned about the reservation of rights?

5        A    I don't know.  I don't know.

6             MS. CARR:  Object to the form.

7    BY MR. CARBIN:

8        Q    Did you learn what the basis of the reservation

9    of rights was?

10             MS. CARR:  Objection, asked and answered --

11             actually strike that, I don't believe it was asked

12             and answered.  But I'll object to foundation.

13             THE WITNESS:  Yes, vaguely.

14    BY MR. CARBIN:

15        Q    What did you learn?

16        A    That - I know there was - I don't -- strike

17    that.

18             I don't know.  I vaguely recall that - that the

19    insurance company took the position that contract claims

20    weren't covered as opposed to the other claims, there was

21    a difference between those, and those may not have been

22    covered either.  And that's about the extent of my

23    recollection, as vague as it is, I'm sorry to say.

24        Q    And you learned that from Mr. Marshall or

25    Mr. Wampold or someone else?

ROSENBERG & ASSOCIATES, INC.          (973) 228-9100
www.rosenbergandassociates.com

2099c5de-2020-46e3-a45b-d41395fe9302

CONFIDENTIAL

Page 41

1           MS. CARR:  Object to the form.

2           THE WITNESS:  Well, it would have either been

3      Mr. Wampold or Mr. Marshall or reading the

4      correspondence myself, I don't recall.

5  BY MR. CARBIN:

6      Q    When you say the correspondence, are you

7  referring to St. Paul's reservation --

8      A    Yes.

9      Q    -- Exhibit 14?

10     A    Yes.

11     Q    Now, going back to Peterson Exhibit 161, you

12  say -- I'm going to read part of this, only for the sake

13  of brevity:  Quote, it seemed to me my proposal was a

14  really good deal for the client.  Are you referring to

15  Christensen here as the client?

16     A    Yes.

17     Q    Really good deal for the client if they could

18  get a very valuable endorsement for the product,

19  essentially paid for by the insurance company; and I'm

20  going to end the quote there.

21           Can you explain for me what - what you were

22  talking about there?

23           MS. CARR:  Object to the excerpt --

24           THE WITNESS:  Yes.

25           MS. CARR:  -- and removing context.

CONFIDENTIAL

Page 42

1        Sorry.  Go ahead.

2        THE WITNESS:  What I think I meant by that was,

3    that if we could reach a settlement that included the

4    element of Woods - being able to use Woods' statement

5    that he was very pleased and happy with his

6    Christensen Yacht, as a part of the settlement, and

7    that the financial considerations to the part of the

8    settlement, that is, paying Baldridge's attorney's

9    fees and costs, were covered by the insurance

10   company, then we would have gotten an endorsement

11   from Woods, and the price of it would have been

12   apology of some kind and the attorney's fees and

13   costs.  So that there was something in it for

14   everyone.

15        (Peterson Exhibit 162 was marked for

16        identification.)

17   BY MR. CARBIN:

18       Q    Mr. Peterson, I show you what we've marked as

19   Peterson 162.

20       A    Yes.

21       Q    It appears to be a letter from Mr. Marshall --

22   excuse me.

23       A    Mr. Lane.

24       Q    Mr. Lane of - Mr. Marshal's partner dated

25   December 15th, '05 to yourself.  Do you recall receiving

CONFIDENTIAL

Page 44

1      it's in response to my inquiry about insurance.  So,

2      whether Dennis Lane called me before he sent this

3      along and this was just a confirmation of what he

4      told me, I don't recall.

5  BY MR. CARBIN:

6      Q    Okay.  Take a look at the attachment to this

7  letter.

8      A    Surely.

9      Q    And I'm going to draw your attention to the

10 fourth page of the exhibit.

11          MS. CARR:  Can you identify it by Bate stamp

12     number?

13          MR. CARBIN:  I was about to.

14          MS. CARR:  Thank you.

15 BY MR. CARBIN:

16     Q    Bait stamp PM003330, okay.  It's got a box at

17 the bottom, box number 7:  Limits of Insurance; do you see

18 that?

19     A    Yes.

20     Q    Do you recall ever reviewing that?

21     A    I don't recall, but I probably looked at this

22 policy, if he sent it to me, yes.

23     Q    You see there is a limit here for defense costs,

24 limit of a million dollars?

25     A    Yes.

CONFIDENTIAL

Page 45

1    Q    Do you recall attributing any significance to
2  that at the time?
3              MS. CARR:  Objection, foundation.
4              THE WITNESS:  I don't recall.
5  BY MR. CARBIN:
6    Q    Do you attribute any significance to it now?
7    A    Yes.
8    Q    What's that?
9    A    Well, if the limits were a million dollars, so
10  that - for the defense of the case, that could easily have
11  been exceeded taking this case to trial.
12    Q    Why so?
13    A    Because the time in it and effort involved in
14  defending this case was substantial.
15    Q    What would that mean in terms of considering a
16  settlement disposition?
17    A    What do you mean what would it mean?  I'm sorry.
18    Q    Would you give that any weight in terms of
19  evaluating your settlement disposition for Christensen?
20    A    I'm sure Christensen would give it weight,
21  because their exposure for the defense cost beyond the
22  policy would have been substantial.
23    Q    Do you recall ever discussing that exposure with
24  anybody in the Christensen group?
25    A    I don't recall, no.

ROSENBERG & ASSOCIATES, INC.          (973) 228-9100
www.rosenbergandassociates.com
2099c5de-2020-46e3-a45b-d41395fe9302

CONFIDENTIAL

Page 46

1    Q    I'm going to jump ahead to the mediation for a
2  moment.  Do you recall ever discussing that exposure with
3  anybody at the mediation?  And to be clear, I'm talking
4  about the exposure to Christensen in excess of a million
5  dollar defense limit.
6    A    I believe so, but I can't recall.

*Objection: No pending question*

7    Q    Who do you think you discussed that with?
8    A    Well, the people in the room.
9    Q    And who was that?
10   A    Mr. Wampold, Mr. Friedland, Mr. Foggia,
11  Mr. Luken and Mr. Wade.
12        (Peterson Exhibit 163 was marked for
13        identification.)
14  BY MR. CARBIN:
15   Q    Mr. Peterson, I show you what we just marked as
16  Exhibit Peterson 163, and the first page is a cover sheet
17  from St. Paul to Casey Marshall dated February 21, 2006.
18  But I really want to draw your attention to the second
19  page which -- Can you tell me if you recognize the
20  document beginning on the second page?
21   A    It looks like a bill from my law firm.
22   Q    On the Christensen matter?
23   A    Yes.
24   Q    And if we turn to the second page of that bill,
25  Bait Stamp PM 760.  I take it, that your entries are under

CONFIDENTIAL

Page 52

1    that one way or the other.  I can't remember whether

2    Tiger Woods had even read the contract.

3    BY MR. CARBIN:

4        Q    Would it be fair to say that it was plaintiffs'

5    theory in the case, as far as you came to learn it, that

6    what Mr. Lance did or supposedly did, they contended was a

7    violation of the contract?

8        A    And a violation of Florida Statute and a

9    violation of his right to privacy and --

10       Q    Is that a yes, they did consider it a

11    violation --

12       A    Yes, among other things.

13       Q    You know the drill, I have to finish --

14       A    Oh, sorry.

15       Q    -- and you do also.  Makes her life easy.

16       A    Surely.

17       Q    Let's go back to your email, Exhibit 72.  And in

18    the first line, you say:  Mike, after reading Tiger's depo

19    last night, I am more convinced than ever they don't have

20    a case so far.

21           Why did you say that at this time you were

22    convinced they didn't have a case?

23       A    Because in Mr. Woods' deposition, it became real

24    clear to me that he knew very little about it and - and he

25    couldn't support their claim.

CONFIDENTIAL

Page 53

1    Q    Did that ever change between the time you wrote
2    this email on March 1, 2006, and the day of the mediation,
3    April 24, 2006?
4        A    Did what change?
5        Q    Your evaluation of his ability to support the
6    claim?
7        A    Not of Mr. Woods' ability to support the claim,
8    no.
9        Q    On the second page of the email, at the end of
10   your email, you begin to talk about the damages claim.
11   You say:   Quote, his only damage claim is the loss of
12   future potential earnings from a boat deal endorsement (I
13   don't know from who, unless you plan to lie in an ad
14   because Christensen was not going to use him and that is
15   the boat he owns).   Do you see that?
16       A    Yes.
17       Q    What were you indicating there?
18       A    Mr. Woods' complaint in his deposition with
19   regard to damages, one of his claims was that how he was
20   damaged was that he - he couldn't do a boat deal, if you
21   will, as opposed to a Buick deal or whatever.   He couldn't
22   do a deal for an endorsement of a yacht, because all this
23   publicity had already occurred tying his name to
24   Christensen.   And my query was, I don't know how he could
25   have done that in the first place, endorsed some other

ROSENBERG & ASSOCIATES, INC.          (973) 228-9100
www.rosenbergandassociates.com
2099c5de-2020-46e3-a45b-d41395fe9302

CONFIDENTIAL

Page 54

1    yacht when he, in fact, owned a Christensen yacht, but I
2    suppose, you know, one could.   I don't suppose he drives a
3    Buick either, but endorses them.
4            MS. FOLEY:   And Intervenors designated all
5        testimony of Mr. Woods' deposition as attorney's eyes
6        only.
7    BY MR. CARBIN:
8        Q    Now, in this email you say that Christensen was
9    not going to use him for an endorsement; where did you get
10   that from?
11       A    That's what they had agreed to.
12       Q    They, who?
13       A    Christensen.
14       Q    Agreed to where?
15       A    Not using Mr. Woods as an endorsement, the whole
16   injunction and TRO, etcetera.
17       Q    Did there come a time after this, in later
18   March 2006, where there was another effort to settle the
19   case with the Woods camp?
20       A    Prior to the mediation?
21       Q    Yes.
22       A    I don't recall, no.
23            (Peterson Exhibit 164 was marked for
24            identification.)
25   BY MR. CARBIN:

CONFIDENTIAL

Page 72

1    Q    What did you understand him to be referring to

2  when he spoke about for insurance purposes?

3         MS. CARR:   Objection, asked and answered.

4         THE WITNESS:   I don't know, actually, but I

5         think I would have thought that for insurance

6         purposes, meaning whether the insurance company was

7         to be involved or not.

8  BY MR. CARBIN:

9    Q    How would the mention of a non-material breach

10 relate to the involvement of the insurance company?

11        MS. CARR:   Objection, calls for speculation.

12        THE WITNESS:   Well, I'm not sure.  But - but as

13        I recall this proposal, the guts of this proposal had

14        to do - Mr. Foggia's for settlement, had to do with

15        the selling to the Woods a new yacht and reselling

16        their old yacht, none of which would concern the

17        insurance company.  Insurance company wouldn't be

18        paying for any of that.

19        MR. CARBIN:   Let's mark this.

20        (Peterson Exhibit 165 was marked for

21        identification.)

22        MR. CARBIN:   Show you, Mr. Peterson, what we've

23  marked as Exhibit 165.  There is a copy for you,

24  Counsel.

25        MS. CARR:   Thank you.

2099c5de-2020-46e3-a45b-d41395fe9302

CONFIDENTIAL

Page 73

1    BY MR. CARBIN:

2         Q    Do you recognize this?

3         A    Yes.

4         Q    What is it?

5         A    It's an article that I wrote when I was

6    president of the Bar for the Bar News, a monthly column.

7         Q    And generally, what was the article about as you

8    recall?  I see it's dated June 2001.

9         A    I have to read it again.

10        MS. CARR:  I would like an opportunity to review

11   it as well before you ask any questions, because this

12   is the first I've seen it.

13        MS. FOLEY:  Can I get the title and date of the

14   article?

15        MS. CARR:  June 2001, The Truth, the Whole Truth

16   and Nothing But the Truth, by Jan Eric Peterson, WSBA

17   President.

18        MS. FOLEY:  Thank you.  Website:

19   Http:www.wsba.org/media/publication/barnews/archives/2

20   001/jun-01-truth.htm.

21        MR. CARBIN:  Do you need time to read this?

22        THE WITNESS:  Yes.

23        MS. CARR:  I've asked for time to as well.  It's

24   common courtesy to provide it to me.

25        THE WITNESS:  Okay, I've read it.

CONFIDENTIAL

Page 74

1   BY MR. CARBIN:

2       Q    Generally, what's the point of this article?

3       A    Tell the truth.

4       Q    Particularly for attorneys?

5       A    Yes.

6       Q    And, in fact, you say that honest and

7   truthfulness should be the, in italics, core value of our

8   profession.

9       A    Yes.

10      Q    And you say little white lies are not

11  acceptable.

12      A    Yes.

13      Q    And you demand scrupulous honesty of counsel.

14      A    Yes.

15      Q    Did you mean that when you wrote it?

16      A    Yes.

17      Q    Is that consistent with the oath that you've

18  taken today?

19      A    Yes.

20      Q    Look back at Exhibit 74, if you would.

21      A    Sure.  If I can find it.  Yes.

22      Q    When you read Mr. Marshall's email saying that:

23  For insurance purposes, I'd feel better if we didn't even

24  mention a non-material breach.  Did you understand that to

25  refer to breach of contract, which was the basis of

ROSENBERG & ASSOCIATES, INC.        (973) 228-9100
www.rosenbergandassociates.com

CONFIDENTIAL

Page 82

1    did send his proposal out to Mr. Hubman?

2         A    Well, it doesn't refresh my memory, because I

3    don't have any memory of him sending it out.

4              MS. FOLEY:  Intervenor's designate this document

5         as confidential.

6              THE WITNESS:  But it looks like he did, and has

7         a response from Mr. Hubman saying give me some time

8         to get back to you.

9              MR. CARBIN:  Okay.  This is a good time for a

10        break for me, if that's good for everybody else.

11             MS. FOLEY:  That's fine with me.  How long?

12        Could we go until at least 12:30?

13             MR. CARBIN:  12:45.  Do you need more?

14             MS. FOLEY:  That should be fine for me.

15             MR. CARBIN:  Let's say 12:45.

16             (A lunch recess was taken.)

17   BY MR. CARBIN:

18        Q    Does an insured, such as, Christensen owe its

19   insurer, such as, St. Paul a duty of good faith?

20             MS. CARR:  Objection, lack of foundation.

21             THE WITNESS:  I don't know that they do.  They

22        owe them a duty of cooperation depending on the

23        language of the policy, I suppose, but...

24   BY MR. CARBIN:

25        Q    Are you aware of the Washington statute that

CONFIDENTIAL

Page 83

1   provides for a duty of good faith to the parties to an

2   insurance contract?

3       A    No.

4       Q    Under Washington law, does an insured, such as

5   Christensen, owe its insurer, such as, St. Paul a duty of

6   good faith?

7           MS. CARR:  Objection, asked and answered.  Lack

8       of foundation given prior testimony.

9           THE WITNESS:  I guess I don't know.  I don't

10       represent insureds and insurance companies, as a

11       general rule, so I don't know that relationship.

12  BY MR. CARBIN:

13      Q    Now, you mentioned a duty to cooperate under the

14  policy, are you speaking about the St. Paul/Christensen

15  policy, or policies in general?

16      A    In general.

17      Q    Have you reviewed the St. Paul/Christensen

18  policy to see if it has a duty to cooperate clause in it?

19      A    I have not, at least I don't recall it.  May

20  have, but I don't recall.

21      Q    What do you understand that the duty to

22  cooperate requires of an insured?

23          MS. CARR:  Objection.  Objection, vague;

24      improper hypothetical to the question.

25          THE WITNESS:  I just want you to repeat it.  I'm

CONFIDENTIAL

Page 84

1    sorry.

2         MR. CARBIN:  Read it back, please.

3         (The pending question was read back by Madam

4         Reporter.)

5         MS. CARR:  Same objection.

6         THE WITNESS:  My general understanding is, it's

7    to cooperate with the defense of the underlying

8    action that - that the insured is seeking indemnity

9    for.

10   BY MR. CARBIN:

11        Q    And what form would that cooperation take, in

12   your understanding?

13        A    Making himself available for depositions,

14   answering interrogatories and providing whatever evidence

15   they have at hand to the defense.

16        Q    Would it include being candid and forthright

17   with the insurer in terms of the information that's

18   provided?

19        MS. CARR:  Objection, vague; improper

20        hypothetical.

21        THE WITNESS:  I would - I would assume that

22        would involve not providing false information to the

23        insurance company, sure.

24   BY MR. CARBIN:

25        Q    Did you say not providing false information?

CONFIDENTIAL

1    A    Right.

2    Q    I just didn't hear you.

3    A    I understand.

4    Q    And can we also agree that the duty to cooperate

5    would require that the insured not mislead the insurance

6    company in connection with the defense of the case?

7         MS. CARR:   Objection, vague; improper

8    hypothetical.

9         THE WITNESS:   I assume.   I don't know what the

10   requirements between the insured and an insurer are,

11   particularly, because I don't practice in that arena.

12   BY MR. CARBIN:

13   Q    Let me show you an exhibit we previously marked

14   as Wampold Exhibit 63.

15   A    Okay.

16   Q    And it's a - it's a letter on a letterhead of

17   Peterson Young and Putra dated April 7th, 2006 addressed

18   to St. Paul, attention Donna Zeller.   Have you seen that

19   letter previously?

20   A    I don't know.

21        MS. CARR:   Note for the record that Intervenors

22   previously designated this document as confidential.

23        MS. FOLEY:   We designate all testimony about

24   this document confidential as well.   Thank you.

25   BY MR. CARBIN:

CONFIDENTIAL

Page 87

1    Q    Is it fair to say that the two of you had

2    similar views or the same views on the strengths of the

3    Woods' case and the weaknesses of Christensen's case?

4         MS. CARR:  Objection, compound; form.

5         THE WITNESS:  I think, for the most part, yes.

6    BY MR. CARBIN:

7    Q    Would it be fair to say that what Mr. Wampold

8    reported to St. Paul in his letter -- Can you help me with

9    the exhibit there?

10   A    Sixty-three.

11   Q    His letter, 63, was consistent with what you and

12   he were communicating with Christensen in terms of the

13   strengths and weaknesses of the case?

14        MS. CARR:  Objection to the form; leading;

15   assumes facts.

16        THE WITNESS:  I don't know.  I would have to

17   read the letter again and it's quite lengthy.

18   BY MR. CARBIN:

19   Q    All right.  Is there any reason you know of why

20   Mr. Wampold would report to St. Paul an assessment of the

21   case different from what he was reporting to Christensen?

22        MS. CARR:  Objection --

23        THE WITNESS:  No.

24        MS. CARR:  -- form.

25   BY MR. CARBIN:

ROSENBERG & ASSOCIATES, INC.         (973) 228-9100
www.rosenbergandassociates.com

2099c5de-2020-46e3-a45b-d41395fe9302

CONFIDENTIAL

Page 90

1   presence would be, and as I recall, they were not going to

2   be there in person, but were available by telephone, and I

3   don't remember why.

4       Q     Where did you get that information?

5       A     I don't know.  I just - and I don't even know if

6   it's true, I just vaguely recall that.

7       Q     Where did you get the information that St. Paul

8   would be present?

9       A     I think Mike told me that they said they would

10  have a representative there.

11      Q     Do you recall anything else Mike told you about

12  St. Paul's appearance at the mediation?

13      A     Prior to the mediation?

14      Q     Yes.

15      A     I don't recall, but -- No, I don't.  I knew they

16  were going to be there.

17      Q     Can you recall anything about Christensen's plan

18  or strategy for the mediation?

19          MS. CARR:  Objection, asked and answered; also

20      vague as in timeframe.

21          THE WITNESS:  I just don't remember.  Sorry.

22  BY MR. CARBIN:

23      Q     Prior to the mediation, did Mr. Marshall ever

24  indicate that he had had a discussion with the insurers

25  about what position would be taken at the mediation?

ROSENBERG & ASSOCIATES, INC.        (973) 228-9100
www.rosenbergandassociates.com

CONFIDENTIAL

Page 91

1    A    I don't recall that.  I recall, I think the
2  morning of the mediation, when I got down here --
3    Q    I don't want to interrupt you, but I want to
4  stick with leading up to the mediation.
5    A    Well, I'm doing that.  The morning before -
6  before the mediation convened, before we went to the
7  mediation, I was advised that the insurance company had
8  taken a position and, I think, given a letter essentially
9  denying coverage and disputing that they were going to pay
10 any attorney's fees.
11    Q    Well, let's go back to prior to the mediation.
12 Prior to the day of the mediation, which I think we can
13 agree is April 24, 2006.
14    A    I don't remember, but I'll accept that.
15    Q    I think we can agree on that.
16    A    Okay.  Prior to that day.
17    Q    Prior to the day of the mediation, did you ever
18 learn that Mr. Marshall had had a conference with the
19 insurers, including St. Paul, about what position would be
20 taken on behalf of Christensen at the mediation?
21    A    I don't remember that.
22    Q    I'm going to show you what we previously marked
23 as Marshall Exhibit 120, and I think you'll recognize it
24 as a letter from St. Paul to Mr. Marshall dated
25 April 17th, 2006.  Take a moment and look at that, if

CONFIDENTIAL

1      Q    Do you recall any of the discussions with the

2   mediator when he visited the Christensen room?

3      A    Yes.

4      Q    I would assume you've been through more than

5   your share of mediations; is that fair to say?

6      A    Yes.

7      Q    You agree with me that the mediator's primary

8   job is to get the case settled?

9      A    Yes.

10      Q    Would you agree with me that a mediator

11   basically tells each side what their worse case scenario

12   is trying to get them to move?

13          MS. CARR:  Could you read that question back?

14          (The pending question was read back by Madam

15          Reporter.)

16          THE WITNESS:  Sometimes.  Mediators are

17       different, so - but some do, yes.

18   BY MR. CARBIN:

19      Q    Did you find that Mediator Scott was telling the

20   Christensen camp what he saw as problems in the

21   Christensen case?

22      A    He did do that.

23      Q    Did Mediator Scott advise the Christensen camp

24   that he saw that the Tiger Woods case, the plaintiffs'

25   case had problems in terms of their ability to prove

CONFIDENTIAL

Page 101

1    damages?

2        A    Yes.

3        Q    Did you get any additional material from the

4    plaintiffs at the mediation?

5        A    I don't recall any.

6        Q    Did you learn any new information from the

7    plaintiffs at the mediation that you had not known prior

8    to the mediation?

9        A    I don't recall that.  We may have, I just don't

10   remember.

11       Q    When did discovery end in the Woods/Christensen

12   case?

13       A    It had not ended at that time.

14       Q    Had fact discovery ended?

15       A    Had fact discovery ended, I don't remember.  I

16   don't, no.  I'm trying to think if there was anybody -

17   fact witnesses who had yet to be deposed and may have

18   been, but I don't remember who.

19       Q    Do you recall any of the discussions during the

20   day of the mediation?

21       A    Some.

22       Q    What do you recall?

23       A    There were discussions early on about the case,

24   you know, the pros and the cons with the mediator.  And

25   then there were -- I do recall that the plaintiffs, who

CONFIDENTIAL

Page 103

1    Q    Was that expressly discussed?

2    A    I think so.

3    Q    What next happened in terms of the negotiations?

4    A    Some time passed, and the next recollection I

5    have is that the plaintiffs offered, I think it was

6    $2.9 million, and I hope I'm not confusing the 29 and 2.9,

7    but maybe.  In any event, $2.9 million was their demand

8    and I think they wanted, you know, all the other - the

9    apology and the continued order in effect, etcetera,

10   etcetera.

11        And then we had a discussion about how to

12   respond to that, and there had been some indications from

13   Mr. Wade about St. Paul's position and that included that

14   he had authority to settle the case and to settle the

15   attorney's fee question with Christensen.  And there was,

16   at some point during this discussion or during that

17   morning or that day, there was a hint that - that he could

18   maybe pay up to the limits, which were a million dollars.

19        When this $2.9 million demand came to us, we

20   were discussing how to respond to that with some

21   encouragement from Judge Scott, who I think around that

22   time, or at some point in time had indicated as we

23   discussed a moment ago, that he thought we had a problem

24   on liability, that Christensen could lose, but that the

25   other side had a problem with damage proof.  And in any

CONFIDENTIAL

1   event, one of our discussions was that, well, if we lose

2   on liability, we're going to be exposed to, not only our

3   own attorney's fees, but the plaintiffs' attorney's fees

4   and that those are potentially very large.

5          And Mr. Wade indicated at some point then that

6   he had authority for $400,000, and I'm not sure of the

7   sequence here of whether it was subsequent to that that he

8   indicated he might be able to have up to or even close to

9   the policy limits, I think was the language.  But in any

10  event, we discussed numbers to go back at.

11         I do remember suggesting $750,000.  And I think

12  from the discussions we had with Judge Scott, it was

13  indicated that the feeling was that my - some people in

14  the room, that wasn't going to be sufficient.

15         I do recall that Judge Scott had, in response to

16  that 2.9 million, told the plaintiffs to go back and get

17  more realistic and that they did come back with a lessor

18  number, which was $2 million.  And we discussed how to

19  respond to that as, again, I think it was 750 was

20  discussed - because it was concluded that that wasn't

21  going to get it done.

22         And we proposed to go back at $1.2 million and

23  Mr. Wade was present for that discussion and agreed with

24  the decision ultimately to proffer that, but told us that

25  he had - would make a call and made a call and came back

CONFIDENTIAL

Page 105

1   and said that he only had 400,000 and that was all he was
2   going to have.
3           So the 1.2 was conveyed, and so we have
4   $2 million demand and $1.2 million offer and Judge Scott
5   is suggesting that somewhere between the two, the matter
6   should get resolved, and ultimately it did.  But there was
7   some discussion getting to that point and I think the
8   plaintiffs came back at 1.7 and - and I think -- and I
9   just don't recall the details of how it got from there to
10  1.6.  That may have been Judge Scott saying, all right,
11  this number, between 1.5, 1.6, somewhere in there, we
12  should - I'll see if I can get agreement from them, if you
13  offer that, they will accept it or vice versa, I don't
14  remember that.
15          I do remember there was some discussion about
16  the language of the statement that was, in effect, an
17  apology and there was some work about that.
18          At the point that Mr. Wade said that he only had
19  $400,000 and was not going to get any more, he was asked
20  to leave the room while the Christensen people spoke with
21  their coverage counsel.
22      Q    At about what time of day was that?
23      A    Late in the day, but I don't remember when.
24      Q    Okay.  Do you recall Mr. Wade being out of the
25  room for a period of time?

CONFIDENTIAL

1   BY MR. CARBIN:

2      Q      You indicated that Mr. Wade was out of the

3   Christensen room from about 5:00 to 7:00 p.m. the day of

4   the mediation.  Am I correct that it was during that

5   period that the $1.6 million figure was agreed to by

6   Christensen?

7           MS. CARR:  Objection, misstates prior testimony.

8      Mischaracterizes his assent to your proposal

9      regarding the timeframe, your meaning Mr. Carbin's

10     proposal.  Sorry.

11          THE WITNESS:  I'll ask you to read it back.

12          (The pending question was read back by Madam

13          Reporter.)

14          MS. CARR:  Same objection.

15          THE WITNESS:  I'm sure the $1.6 million figure

16     was discussed while Mr. Wade was out of the room.

17     Whether it was further discussed with Mr. Wade and

18     whether it was communicated to the other side, to the

19     plaintiffs, while he was out of the room, I just

20     don't recall.

21   BY MR. CARBIN:

22      Q    Okay.  Well, do you know if the $1.6 million

23   proposal was ever discussed with Mr. Wade before it was

24   made?

25      A    Before it was proffered to the other side, you

CONFIDENTIAL

Page 123

1    the insured, insofar as it's the contract, for

2    example, requires cooperation and that information

3    and that sort of thing we've already discussed.

4  BY MR. CARBIN:

5       Q    Will you expect that defense counsel acting for

6  the insured would act consistent with that duty to

7  cooperate of the insured to the insurer?

8       A    Yes.

9            MS. CARR:  I'm sorry.  Objection, incomplete

10       hypothetical at this point, depends upon the clause

11       of the contract as previously testified, which has

12       not been disclosed.

13  BY MR. CARBIN:

14       Q    Why?

15       A    I'm sorry.

16       Q    Why?

17       A    Why what?

18       Q    Why would you expect that defense counsel would

19  have to act consistent to the insurer with the insured's

20  duty to cooperate?

21       A    For the benefit of the insured.  I'm sure they

22  kept their coverage by cooperating with their carrier to

23  the extent required.

24       Q    Now, you're aware that Peterson Young and Putra

25  were approved by St. Paul to defend Christensen?

CONFIDENTIAL

1      A     What I'm saying was the duty - first duty was to

2      the client.  And only when the client's interest and the

3      insurance company's interest were the same, if there was a

4      conflict in those interests, then our duty was to the

5      client, not to the insurance company; but other than that,

6      I'm not sure.

7          Q     What happens when there is a split interest

8      between an insurance company and the client in terms of

9      defense counsel?  Can defense counsel properly get in the

10     middle, if you will, of that coverage dispute?

11          MS. CARR:  Objection, foundation; calls for

12          speculation; vague; incomplete, improper

13          hypothetical.

14          THE WITNESS:  It can or should, I suppose, is

15          the question.

16     BY MR. CARBIN:

17          Q     I left out should.

18          A     Which is why we asked Christensen to get

19     coverage counsel.

20          Q     And you asked them to get coverage counsel

21     because you didn't want your office in the middle of a

22     coverage dispute, you and Christensen and St. Paul?

23          A     Right.

24          MS. CARR:  Objection, there was no question.

25          THE WITNESS:  And that they needed expert

CONFIDENTIAL

Page 130

1    A    Waiting, yes, somewhere outside.  In the lobby
2 as you pointed out, I think, was the place.  I remember
3 seeing him and talking to him there briefly.

4    Q    Do you recall what you spoke to him about?

5    A    I don't.  I don't.

6    Q    Have you spoken to him since that day?

7    A    No.

8    Q    Have you spoken to Mrs. Zeller?

9    A    No.

10   Q    I guess you never spoke to her, right?

11   A    Right --

12        MS. CARR:  Objection, misstates prior testimony.

13        THE WITNESS:  I thought maybe I had once, but...

14 BY MR. CARBIN:

15   Q    With the exception of what you told us earlier?

16   A    Right.

17   Q    Since the mediation, have you spoken to anybody

18 at St. Paul?

19   A    No.

20   Q    Do you recall that during the mediation a letter

21 from St. Paul, Mrs. Zeller was received by Mr. Marshall --

22 that's a bad question.

23        Do you recall during the mediation, Mr. Marshall

24 -- withdrawn.

25        Did you learn of a letter that St. Paul had sent

CONFIDENTIAL

Page 131

1   to Mr. Marshall concerning the sharing of legal fees?

2        A     Was I aware of it; is that the question?

3        Q     Yes.  Actually, the question was:  Did you learn

4   of it?

5        A     Yes, I think I did.

6        Q     Okay.

7        A     I think there was --

8        Q     Was there a discussion of that at the mediation?

9        A     Yes.

10       Q     Were you involved in that discussion?

11       A     Well, I was there and that was - the

12   question was raised.  Mr. Marshall got a letter.  I think

13   he said, I got the letter, but we were aware of the

14   contents to the letter earlier than that day, like I said,

15   in the morning of - and - but he said he got the letter.

16   So and -- question of who was going to pay our attorney's

17   fees.

18       Q     Was there any discussion during the day of the

19   mediation about responding to St. Paul's letter on behalf

20   of Christensen?

21       A     Well, Mr. Wade was right there in the room and

22   so it was discussions with him and he indicated he had

23   authority to - to resolve that issue too.  So, there

24   wasn't discussion out - that I know of, outside of the

25   room with anybody else.

CONFIDENTIAL

Page 138

1    Q    In your email to Mr. Baldridge you said:  Quote,
2  you said yesterday you would help us any way you could
3  with the insurance company.  This is what we need to get
4  it done, end of quote.  You see that?
5    A    Yes.
6    Q    Did you have a discussion with Mr. Baldridge on
7  the day of the mediation about his assistance in getting
8  the insurance company to make a payment?
9    A    Yes.
10    Q    Okay.  What assistance did you ask of under
11  Baldridge?
12    A    Damage information.
13    MS. FOLEY:  Intervenors designates this
14  testimony about this conversation confidential.
15  BY MR. CARBIN:
16    Q    Was there anything in particular that you asked
17  for from Mr. Baldridge about damage information?
18    A    I don't recall.
19    Q    Why were you asking for damage information from
20  Mr. Baldridge for the insurance company?
21    A    To - to verify their assertion, the mediator's
22  assertion --
23    Q    Their who?
24    A    Woods, through their counsel, Mr. Baldridge's
25  assertion, the mediator's assertion, and our assessment of

CONFIDENTIAL

Page 139

1  the exposure for potential damages.

2      Q     So you are looking to get plaintiffs' draft

3  expert report to validate your assessment?

4      A     To - to document it, yes.

5      Q     To --

6      A     Because the mediator had told --

7      Q     Let's stick with my question, please.

8          MR. CARBIN:  Can I have the question back?

9          (The question was read back by Madam Reporter.)

10 BY MR. CARBIN:

11     Q     At the top of this second page of Baldridge 128,

12 there is a quote of an email from you to Mr. Baldridge

13 April 25, 4:57 p.m.  The mediator told us you would give

14 the report or even a draft of same.  Do you see that?

15     A     Yes.

16     Q     And it goes on to say, because he understood

17 that insurance people need to paper their file to get

18 authority, aside from coverage issues.  Do you see that?

19     A     Yes.

20     Q     Do you recall the mediator saying that?

21     A     I don't now, but I - I do recall the mediator

22 understanding that it would be helpful for the insurance

23 company to provide this report or even draft of the report

24 to document the assertions of the damage claim.  And I

25 believe that the mediator, in fact, had conversations with

CONFIDENTIAL

Page 140

1    Mr. Wade separate and apart from us.  Now, what they

2    talked about, I don't know.  Could have been talking about

3    baseball, for all I know, but I know they were chatting in

4    his office.

5         Q    When the mediator indicated that he understood

6    that insurance people need to paper their file to get

7    authority, did you follow what he was speaking about?

8              MS. CARR:  Objection, foundation.  At this

9         point, calls for speculation given prior testimony.

10             THE WITNESS:  My impression was that what he was

11        talking about was they would -- We had been asking

12        for damage proof for a long time.

13   BY MR. CARBIN:

14        Q    We, being the Christensen group?

15        A    Yes, the counsel, my partners and I, asking

16   Baldridge and the other side for damage proof, damage

17   proof, damage proof.  In fact, that was part of our motion

18   to dismiss, was that there wasn't any damage proof.  And

19   we - we then were, you know, told by the mediator, by the

20   other side that they had expert support and documentation

21   for the $55 million claim and we said, you know, we want

22   to see it before the deadline, because the insurance

23   company needs it and that's what this is in reference to.

24   So, that's what I understood him to be saying, the

25   mediator.

CONFIDENTIAL

1    Q    Okay.  When he says he understood that insurance

2  people need to paper their file to get authority aside

3  from coverage issues, why - what did you understand the

4  mediator to mean when he was talking about insurance

5  people needing to paper their file?

6          MS. CARR:  Objection, foundation; calls for

7  speculation given prior testimony.

8          THE WITNESS:  To put something in writing in

9  their file to justify an increase in their authority.

10          (Peterson Exhibit 168 was marked for

11          identification.)

12          MR. CARBIN:  I have to apologize, I don't think

13  I have an extra copy.

14          MS. CARR:  That's okay, we'll just get them at

15  the end, like the rest of the exhibits today, except

16  for two.

17  BY MR. CARBIN:

18    Q    Would you look at Exhibit 168, sir, and it

19  appears to be two emails.  The top one being from

20  Mr. Dykstra with a copy to you, dated April 26th, 2006

21  at 10:29 a.m.  Do you recall receiving this?

22    A    No, I don't; but I'll assume I did.

23    Q    Do you see that Mr. Dykstra is advising

24  Mr. Baldridge that he agrees with various conditions

25  Mr. Baldridge placed on providing a copy of plaintiffs

CONFIDENTIAL

Page 153

1   yeah.

2           I had the impression at some point, either

3   during or at the end of the mediation that the 1.6 figure

4   would just about cover Mr. Baldridge's attorney's fees and

5   costs and some redecorating of a bedroom suite by

6   Mrs. Woods.

7       Q    Where did you get that understanding from?

8       A    I don't recall.

9           MS. FOLEY:  Designate all testimony regarding

10       this discussion and Mr. Peterson's understanding as

11       confidential.

12   BY MR. CARBIN:

13       Q    After the agreement was reached with the Woods

14   camp - and it included an apology; is that fair to say?

15           MS. CARR:  Objection.  Which agreement?

16           THE WITNESS:  If you're referring to the

17       settlement agreement.

18   BY MR. CARBIN:

19       Q    Yes.

20       A    Yes.

21       Q    Did Dave Christensen raise any issue about the

22   apology after it was agreed to?

23       A    Yes.

24       Q    What was that?

25       A    I wasn't - I don't think I spoke to him about

Objection
401,
402,
403

CONFIDENTIAL

Page 154

1    it, but I was told he was mad as hell.

2        Q    What was he mad at?

3        A    He was mad that anybody apologized for anything.

4        Q    That's pretty much the same position he had from

5    when the idea was first floated?

6        A    Yes.

7        Q    You mention that you wrote some notes during the

8    mediation.   When did you write those notes?

9        A    At the mediation.

10       Q    What part of the mediation?

11       A    During the day, as we went along.

12       Q    And were these notes in preparation for

13   something?

14       A    No.   Just keeping track of where we were at, as

15   we went along.   And - and a couple of notes, I suppose as

16   is my practice, about the things that the other side said

17   that might be useful to us in the litigation should this

18   not settle, where they were coming from, if you will.

19       Q    Useful in the litigation between Woods and

20   Christensen?

21       A    Yes.

22       Q    I'd like to show you what we previously marked

23   as Exhibit 64.

24       A    Okay.  It's huge.

25       Q    I understand that this is the contract between

CONFIDENTIAL

Page 199

1          certain of the claims, yes.

2    BY MR. CARBIN:

3          Q    And because of that, did you recognize that

4    Christensen's interests may be different from St. Paul's

5    interests?

6               MS. CARR:  Objection, vague.

7               THE WITNESS:  Yeah, I have a problem with that,

8          I guess.  In the interest in what?  The interest in

9          Christensen defending the claims and the interest of

10         St. Paul in that being done should have been the

11         same.

12   BY MR. CARBIN:

13         Q    Well, when you have a coverage issue, obviously,

14   the interests aren't fully aligned; do you recognize that?

15         A    Well, as to the interest of coverage, yes; but

16   not to the interest of the litigation.

17              MS. CARR:  Belated objection to form.

18   BY MR. CARBIN:

19         Q    Right.  When there is a coverage issue between

20   an insured and an insurer, is it appropriate for defense

21   counsel, having been approved by the insured and being

22   paid by the insurer, to involve itself in those coverage

23   issues?

24              MS. CARR:  Objection; asked and answered; form;

25         foundation.

*[handwritten margin note: Objection: foundation; Incomplete answer b/c counsel cutoff the answer]*

ROSENBERG & ASSOCIATES, INC.        (973) 228-9100
www.rosenbergandassociates.com

2099c5de-2020-46e3-a45b-d41395fe9302

CONFIDENTIAL

1      THE WITNESS:  I don't know the answer to that.

2      I guess, it's not my area of practice and so I'm not

3      particularly sure.  But in response to that --

4  BY MR. CARBIN:

5      Q     If you don't know, sir --

6      A     -- we did get Mr. Dykstra involved for that

7  purpose.

8      Q     And then you told him - Mr. Wampold here told

9  him what to do, right?

10     A     He made a suggestion.

11         MS. CARR:  I'm sorry.  Could you please read

12     that question back?

13         (The question was read back by Madam Reporter.)

14         MS. CARR:  Objection, argumentative; vague.

15         THE WITNESS:  What he said he would like the

16     following letter to go to Mrs. Zeller, yes.

17  BY MR. CARBIN:

18     Q     Does the fact that Mr. Wampold drafted a letter

19  from Mr. Dykstra to send to St. Paul stating that

20  Christensen will - Christensen would not file its motion

21  for summary judgment, unless St. Paul made the agreement

22  here, cause you any concern whatsoever about the propriety

23  of this approach?

24         MS. CARR:  Objection, asked and answered.

25         THE WITNESS:  No, because Christensen had

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### CERTIFICATE OF SERVICE

I, Julia Crippen, hereby make the following Declaration from personal knowledge:

On the 13th day of August, 2007, I presented the attached document to the Clerk of the Court for filing and uploading to the CM/EFC system.  In accordance with their ECF registration agreement and the Court's rules, the Clerk of the Court will send e-mail notification of such filing to the following attorneys:

A. Richard Dykstra (rdykstra@staffordfrey.com)
Kenneth Hobbs (khobbs@staffordfrey.com)
Heather L. Carr (hcarr@staffordfrey.com)
Danford Duncan Grant (dgrant@sstaffordfrey.com)
Stafford Frey Cooper
601 Union Street, Suite 3100
Seattle, WA  98101

Daniel F. Knox (dknox@schwabe.com)
Noah Jarrett (njarrett@schwabe.com)
Schwabe, Williamson & Wyatt
1211 SW 5th Ave, Suite 1900
Portland, OR  97204

James W. Carbin (jwcarbin@duanemorris.com)
Duane Morris LLP
The National Building
744 Broad Street
Newark, New Jersey 07102

J. Douglas Baldridge (jdbaldridge@venable.com)
Danielle R. Foley (drfoley@venable.com)
Venable LLP
575 7th Street, NW
Washington, DC 20004-1601


I HEREBY DECLARE UNDER PENALTY OF PERJURY under the laws of the United States of America and the State of Washington that the foregoing is true and correct.

EXECUTED this 13th day of August, 2007, at Seattle, Washington.

/ s/ Julia Crippen
Julia Crippen

119178.0006/1347478.1